```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/5/2014
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

THE REGULATORY FUNDAMENTALS    :
GROUP LLC,    :
    :
    Plaintiff,    :
    :
    -v-    :    13 Civ. 2493 (KBF)
    :
GOVERNANCE RISK MANAGEMENT    :    <u>OPINION & ORDER</u>
COMPLIANCE, LLC d/b/a MANHATTAN    :
ADVISERS, et al.,    :
    :
    Defendants.    :

------------------------------------------------------------ X

KATHERINE B. FORREST, District Judge:

A party to a lawsuit may not destroy relevant evidence without consequence. The nature and magnitude of the consequence follows from the level of culpability. Was, for instance, the destruction of evidence inadvertent and the result of an oversight? Or was it the product of a plan?

The individual defendant in this lawsuit destroyed a large number of highly relevant documents – preventing plaintiff and any finder of fact from ever knowing the full truth of what occurred. Following discovery, lengthy briefing, and an evidentiary hearing, the Court has found that defendant's destruction was planned, repeated, and comprehensive. It was malicious. This finding is particularly unfortunate in light of the plain fact that the spoliation has turned what was a straightforward commercial dispute into a far more serious issue.

The spoliator here – defendant Gregory V. Wood – is a graduate of Cornell Law School and a member of the bar of the State of New York. His conduct has resulted in entry of judgment against him.

1

The Court's Opinion and Order is set forth below.

On April 15, 2013, The Regulatory Fundamentals Group LLC ("RFG") sued Wood and two of Wood's corporate entities, Governance Risk Management Compliance, LLC ("GRMC") d/b/a Manhattan Advisers ("MA") and Manhattan Advisers, LLC ("MAL"), for copyright infringement.  On several occasions after a preservation obligation had attached, Wood deleted a large number of relevant emails from his computer; he separately took steps on two different occasions to terminate his contract with a web hosting service that stored additional relevant emails and electronic documents, and took affirmative steps to ensure that these materials were permanently destroyed.  Then, following RFG's discovery of the spoliation and unwillingness to overlook it, Wood took steps to create a false record of mere negligence.  The steps were insufficient and his culpability is clear.  Indeed, there is no room for doubt.

I.    BACKGROUND

RFG is a three-year-old company that provides "consulting services and business solutions to investment funds, advisors, investors, and their service providers."  (First Amended Complaint ("FAC") ¶ 1, July 12, 2013, ECF No. 21.)  As part of the services it provides to clients and prospective clients, RFG generates "a substantial amount of original material that is protected under copyright" about evolving financial regulations.  (<u>Id.</u> ¶ 13.)

RFG distributes its original, copyrighted material in the following ways:  (1) through "its web-based RFG Pathfinder® knowledge management system," which is a password-protected, fee-for-subscription database; (2) through a blog on its

website; and (3) through various email communications.  (<u>Id.</u> ¶¶ 14-16.)  In its email communications, "RFG offers the RFG Watch® service, an interactive regulatory alert system that informs RFG's subscribers of relevant and recent regulatory requirements and proposes responses to regulatory events.  Also as part of the RFG Watch service, RFG provides email updates to its customers and potential customers through RFG Deep Dives™ and RFG Weekly Roundup™ newsletters."  (<u>Id.</u> ¶ 16.)

Wood's businesses, GRMC and MAL, worked in concert to help financial institutions comply with regulatory requirements.[1]  (<u>Id.</u> ¶ 22.)

On October 30, 2012, RFG and GRMC entered into a services agreement ("the Agreement").  (<u>Id.</u> ¶ 23.)  Pursuant to the Agreement, "GRMC was responsible for obtaining customers whom RFG would then provide with access to RFG Pathfinder® and RFG Watch® . . . through a white-label website <u>created by RFG</u>."  (<u>Id.</u> ¶ 24 (emphasis added).)  "In other words, the website would contain RFG's copyrighted content, but would display GRMC's name and marks" and "would also include the phrase 'Powered by RFG Pathfinder®' or a substantially similar phrase."  (<u>Id.</u> ¶ 22.)  Put simply, RFG would create the website and it would populate that site with its own copyrighted content.  In connection with the Agreement, RFG emailed to Wood copyrighted content contained in RFG Pathfinder® and RFG Watch®.  (<u>Id.</u> ¶ 25.)

---

[1] In an affidavit, Wood describes the relationship between his two corporate entities as follows: "I founded [GRMC] . . . I also formed [MAL], which was intended to be the entity that did the selling, while GRMC was going to do the work.  I eventually decided to do everything through [MAL]." (Affidavit of Gregory V. Wood ("Wood Aff.") ¶ 8, May 16, 2014, ECF No. 111.)

RFG alleges that defendants breached the Agreement almost immediately. (Memorandum in Support of Plaintiff's Motion for Spoliation Sanctions ("Pl.'s Mem.") at 3, May 2, 2014, ECF No. 96.)  RFG contends:  "The [ ] Agreement did not grant any right to GRMC to copy, modify, and/or distribute the works, and it expressly stated that the license did not give GRMC the right to use [RFG's] works for its own internal purposes."  (Id.)  Yet, according to RFG, defendants improperly "copied [p]laintiff's works; modified the works by stripping [p]laintiff's copyright management information and replacing it with MAL's copyright notice; and posted the modified version on MAL's website and distributed them via email to hundreds of third parties."  (Id.)  Wood does not dispute that he distributed RFG's content via emails he sent to third parties.  (Wood Aff. ¶¶ 17-18.)  Wood contends that his conduct was in accordance with the Agreement.

On March 19, 2013, RFG sent Wood a cease-and-desist demand.  (See Declaration of Benjamin T. Alden in Support of Plaintiff's Motion for Spoliation Sanctions ("Alden Decl."), Ex. D, May 2, 2014, ECF No. 97.)  On April 15, 2013, RFG commenced this litigation (ECF No. 1), and on May 31, 2013, it served a document request on each defendant.  (Pl.'s Mem. at 4; ECF No. 8.)  These requests included, inter alia, demands for the following:

- Any and all documents or communications referring or relating to, or including, RFG's Copyright-Protected Materials in any form, whether or not the document or communication contains any reference to RFG and/or whether or not RFG's Copyright-Protected Materials have been modified, altered, edited, or excerpted in any way.

- Any and all documents or communications referring or relating to any entity or individual to whom Defendant[s]

provided RFG's Copyright-Protected Materials in any form, whether or not the document or communication contains any reference to RFG and/or whether or not RFG's Copyright-Protected Materials have been modified, altered, edited, or excerpted in any way.

- Any and all content published on Defendants' Website during the relevant time period, whether currently accessible to the public or not.

(Pl.'s Mem. at 4.)  On June 3, 2013, RFG deposed Wood and "asked him repeatedly about electronic files he had created and/or disseminated that contained [RFG's] copyrighted materials."  (<u>Id.</u>)

On June 19, 2013, the Court held an initial pretrial conference.  During the conference, the parties raised a document production issue; the Court Ordered defendants to provide a limited number of materials as an initial production, pending certain motion practice.  (<u>Id.</u> at 5.)  Defendants then filed a motion to dismiss and subsequently, a motion for summary judgment – both of which were denied.  The parties also engaged in unsuccessful settlement discussions.  On February 6, 2014, the Court set a schedule to govern the remainder of the litigation, including full-blown document discovery.

During a telephonic conference between RFG and defendants' counsel on February 24, 2014, defendants' counsel informed RFG's counsel that defendants "might be 'missing certain emails.'"  (<u>Id.</u> at 6; <u>see also</u> Alden Decl. ¶ 11.)  RFG's counsel "expressed concern and pressed for more information."  (Pl.'s Mem. at 6; <u>see also</u> Alden Decl. ¶ 11.)  On March 5, 2014, RFG and defendants' counsel had another telephonic conference.  (Pl.'s Mem. at 6.)  During that conference, defendants' counsel informed RFG's counsel that Wood had terminated his account

with a third-party vendor ("MacHighway") which had hosted the corporate
defendants' websites and email domains.  (Alden Decl. ¶ 12.)  Defendants' counsel
indicated that, although Wood had been "under the impression" that the emails
stored by MacHighway had been downloaded onto his computer, they in fact had
not been.  (Id.)  Accordingly, once Wood terminated his MacHighway account, the
emails maintained by MacHighway were destroyed.  Defendants' counsel further
informed RFG's counsel that once Wood discovered the issue, he had contacted
MacHighway but was told that the electronic files were not recoverable.  (Id.)

Later that day, RFG's counsel and defendants' counsel had another
conversation regarding the "missing" emails.  (Id. ¶ 12.)  On March 5, 2014,
defendants' counsel further conceded that certain emails had been destroyed.  RFG
immediately noticed defendants for a March 12, 2014 deposition so it could obtain
more information regarding what had happened to the electronic files; defendants
failed to appear.  (Id.)

On March 14, 2014, defendants' counsel, Linda Mandel Gates, filed a motion
to withdraw as counsel.[2]  (ECF No. 66.)  That same day, RFG sought leave to file an
expedited motion to compel defendants to appear for a deposition on the issue of the
deleted electronic files, which the Court granted.  (ECF No. 76; Pl.'s Mem. at 7.)
The Court also granted Gates' request to withdraw, subject to a certain conditions.

---

[2] Wood has had three different attorneys represent him during this action and in particular, in
connection with this spoliation motion.  Each counsel has withdrawn from representing him.  (See
ECF Nos. 70, 105, 143.)  Wood is currently proceeding pro se and the corporate defendants', which
cannot appear pro se, see, e.g., Jones v. Niagra Frontier Transp. Auth., 722 F.2d 20, 22 (2d Cir.
1983), are unrepresented.

(See ECF No. 70.)  On March 18, 2014, in accordance with a Court Order, Gates reported the following regarding the deletion of the electronic files:

> [A]s a result of the fact that the Corporate Defendants shut down and ceased business operations in 2013 and Mr. Wood is unemployed, Mr. Wood could no longer afford to pay the [vendor] for the monthly hosting services.  The Corporate Defendants did not have a computer server. Therefore, apparently as a result of the cancellation of the [vendor]'s services, when the [vendor] shut down the Defendants' websites and email service the emails on those websites were not saved.

(Id.; see also ECF No. 72.)

Following additional discovery regarding the deletion of the electronic files, on May 2, 2014, RFG filed the now-pending motion for a finding of spoliation and the imposition of sanctions.  (ECF No. 95.)  This motion became fully briefed on May 23, 2014.  (ECF No. 112.)

On June 10, 2014, the Court held an evidentiary hearing on the spoliation motion.  At that hearing, Gates and Wood testified both in open court and in camera.[3]  On June 25, 2014, the Court held oral argument.  At the conclusion of that argument, the Court ruled from the bench that Wood had engaged in willful

---

[3] On June 5, 2014, defendants notified the Court that they did not waive attorney-client privilege on the issue of Gates' advice to Wood.  (ECF No. 122.)  The Court therefore required certain non-privileged questions to be asked in open court and questioned both Gates and Wood in camera. Following the June 20, 2014 evidentiary hearing, the Court Ordered Wood to inform RFG and the Court whether he voluntarily waived attorney-client privilege in connection with the testimony provided in camera.  (ECF No. 123.)  On June 13, 2014, defendants filed a letter indicating that they agreed to a limited waiver of the attorney-client privilege.  (ECF No. 128.)  Accordingly, on June 20, 2014, the Court Ordered that the entire transcript to the June 10, 2014 evidentiary hearing be made available on the public docket.  (ECF No. 136.)

and malicious spoliation.  (6/25 Tr.[4] 64.)  This Opinion & Order provides the Court's rationale, as well as an Order concerning sanctions.[5]

## II.    FACTUAL FINDINGS

Based on the Court's assessment of the record – comprised of both live testimony and documentary evidence – the Court finds by far more than a preponderance of the evidence (indeed, the evidence is clear and convincing) that Wood engaged in serial spoliation in connection with this litigation.  The Court finds that Wood engaged in such conduct in an attempt to reduce his liability exposure.  When he realized the spoliation would not go unnoticed or be easily overlooked, Wood created a fictitious record and engaged in additional misconduct in an attempt to cover his tracks.[6]

The Court finds, again by more than a preponderance of the evidence (and again, the evidence on this point is clear and convincing), that Wood's knowing and intentional spoliation was done in bad faith.  This determination is based on the chronology of events and relies heavily on the Court's abiding belief that Wood lied during his testimony at the evidentiary hearing.

---

[4] Citations to "6/25 Tr." refer to the transcript of June 25, 2014.
[5] On July 15, 2014, Wood submitted a substantive email to the Court; he included copies of email exchanges with Gates.  (ECF No. 141.)  On July 17, 2014, defendants' then-counsel filed a letter request to be relieved as counsel.  (ECF No. 142.)  Defendants' counsel stated that defendants "have acted in a manner adverse to a workable attorney-client relationship and have reached an impasse . . . with respect to the handling of the case."  (Id.)  On July 18, 2014, the Court granted the request.  (ECF No. 143.)
[6] The Court finds that Wood gave perjurious testimony at the evidentiary hearing on June 10, 2014.

A.  Context

Wood earned a J.D., L.L.M., and M.B.A. from Cornell University.  (Alden Decl., Ex. F at 16.)  He is admitted to practice law in New York and was a practicing attorney for a number of years.  (Id., Ex. C; Wood Aff. ¶¶ 5-7.)

Wood spent most of his legal career as a structured finance and derivatives attorney.  (Wood Aff. ¶¶ 5-7.)  Incredibly, Wood claimed that, until recently, he was unaware of his obligation not to destroy documents relevant to pending litigation. (Id. ¶ 3.)  While it is true that the attorney who represented Wood at the outset of the litigation did not explicitly instruct him on specific document retention obligations, she did send him the document requests and believed that the implication was that he should not destroy documents responsive to those requests. (Tr.[7] 12 (Wood waived attorney-client privilege as to this portion of his prior attorney's in camera testimony).)

Wood concedes that he took civil procedure in law school (which of course discusses basic discovery obligations), passed both the Multistate Professional Responsibility Examination ("MPRE") and the New York State Bar Examination, and has worked as an attorney at large law firms during his career.  While not a litigator, the Court finds that Wood had at least a basic understanding of the moral, ethical, and legal responsibilities of parties and their counsel not to destroy the very documents opposing counsel has requested in a pending lawsuit.

---

[7] Citations to "Tr." refer to the transcript of June 10, 2014.

B. <u>The Emails at Issue</u>

The spoliation here relates to a large number of emails, the precise content of which is ultimately unknown.

Pursuant to the contractual agreement between RFG and GRMC, Wood received from RFG Weekly Roundups, Deep Dives, and other emails containing RFG's copyrighted content.  Upon receipt of those emails, Wood admittedly would "remove any reference to RFG from the emails . . . and [would] send them to [his] email distribution list."  (Wood Aff. ¶ 18.)  At the evidentiary hearing, Wood testified that he sent 10 to 20 mass emails – with between 400 and 500 recipients each time – containing RFG content.  (Tr. 39.)  That is, Wood sent a total of at least 4,000 to 10,000 emails that contained RFG's copyrighted content.[8]  Wood testified that he copied his colleague, Justin Cho, and/or blind carbon copied himself on these emails.  (<u>Id.</u> ¶¶ 11-12, 19.)  Wood also sent out emails "involving Pathfinder" that were intended "to set up marketing meetings to sell Pathfinder," (<u>id.</u> ¶ 20), as well as individualized follow-up emails.  (Tr. 98.)  Cho was not necessarily copied on these follow-up emails.  (Tr. 97-98.)  Wood did not quantify these last, individualized emails, but conceded that they existed.  (<u>Id.</u>)  Neither the Court nor plaintiff can know how many relevant individualized emails existed, nor is it possible to know their content or probative value.

---

[8] During the evidentiary hearing, Wood focused on the 10 to 20 emails that formed the base of what he sent to hundreds of separate addresses.  According to Wood, his spoliation therefore related only to the 10 to 20 emails.  This is plainly an attempt to minimize his misconduct.  Whether the 10 to 20 emails sent to 400 to 500 separate recipients is considered in the aggregate or individually is ultimately beside the point; Wood spoliated these directly relevant emails – and, as discussed <u>infra</u>, his spoliation was not limited to these emails.

The Court finds based on a preponderance of the evidence that the emails Wood sent to third parties containing RFG content, and those that he received in response to or were otherwise triggered by the mass emails, were plainly relevant to this litigation.  Indeed, there is no evidence that Wood deleted any emails that were <u>irrelevant</u> to this litigation.  These emails, had they not been deleted, would show how RFG's information was disseminated by defendants, to whom, under what circumstances, on what occasions, and whether those emails led to further contact, communication, or business.

C.  <u>Chronology of Events</u>

As stated, on March 19, 2013, counsel for RFG sent Wood a cease-and-desist demand, stating:  "Manhattan Advisers and all persons acting in concert with it are hereby directed to cease and desist all copyright infringement against RFG immediately; this includes, at a minimum, deleting all of RFG's copyrighted materials from Manhattan Adviser's website."  (Pl.'s Ex. 1.)  The letter advised that if Manhattan Advisers failed to comply with the cease-and-desist demand, RFG would seek legal recourse.  (<u>Id.</u>)

On April 15, 2013, RFG filed this lawsuit.  (ECF No. 1.)  On May 31, 2013, RFG served its first document requests (Alden Decl., Ex. E), and on June 3, 2013, plaintiff conducted its first deposition of Wood.  (<u>Id.</u>, Ex. F.)

1.  <u>Manual Deletion of Emails</u>

Wood concedes that he manually deleted emails on a number of separate occasions.  First, he would delete "sent" emails as part of his ordinary practice,

11

purportedly in an effort to save space on his computer.  (Wood Aff. ¶ 21.)[9]  He did not change this practice when this lawsuit was filed.  This manual deletion was, of course, not an automated document retention policy – it required Wood to physically delete each email individually.  Second, Wood concedes that he manually deleted emails after and in response to his receipt of the cease-and-desist demand from RFG.[10]  Third, Wood concedes that he manually deleted emails following his initial June 3, 2013 deposition.  Finally, Wood concedes that he manually deleted emails on other occasions – when, he claims, he received information that RFG's content was receiving "hits" or traffic from third parties.[11]

Together, how many emails did Wood manually delete?  The answer is unknown.  According to Wood's own estimate, he deleted 10 to 20 base emails – used to populate the content of his emails to 400 to 500 recipients each – containing RFG copyrighted materials from both his inbox and his sent box.[12]  (Tr. 53.)  Therefore, Wood deleted as many as 4,000 to 10,000 emails; the actual recipients unknown.  Moreover, getting a true picture of the scope of deletions is undermined by Wood's shifting testimony.  For instance, while Wood repeatedly took the position in his papers and before the Court that "this was it" – these were the only emails

---

[9] Notably, Wood did not state his computer was ever space-constrained or short of memory.  Nor did Wood proffer concrete evidence (i.e., more than his say-so) of such a practice prior to receipt of the cease-and-desist demand or filing of this lawsuit.

[10] Wood testified at the evidentiary hearing that upon receiving the cease-and-desist demand, he deleted "as many [of RFG's emails as he] could find."  (Tr. 40; see also Wood Aff. ¶ 28.)

[11] These additional deletions are worth pausing on for two reasons having to do particularly with Wood's credibility.  First, if it were the case that he deleted "as many RFG emails he could find" after receiving the cease-and-desist demand, and if he sent out emails with RFG content prior to that, there should not have been any additional emails with RFG content to delete.  (Tr. 43; see also Wood Aff. ¶ 33.)  In addition, it is nonsensical to suggest that he believed that by deleting emails on his computer, he could somehow control a third party's activities vis-à-vis external content.

[12] When Wood deleted them from his "sent" box, he "double deleted" them by also deleting them from his "deleted items" box.  (Tr. 53.)

deleted, (tr. 38), that was untrue.  Upon questioning by the Court, Wood conceded that he had deleted additional emails reflecting individualized communications with third parties – for instance, as follow up to or arising from the mass emails he sent.  (Tr. 98.)

### 2.  First Termination of the MacHighway Account

In addition to Wood's manual deletion of emails, he engaged in further affirmative conduct to destroy relevant evidence.  As mentioned, he used a company called MacHighway to host the corporate website for GRMC/MAL and its associated email domains.  (See Wood Aff. ¶ 10; Pl.'s Mem. at 10 (explaining that MacHighway hosted and stored all of defendants' electronic files).)  The MacHighway account was accessible through a website that Wood accessed using his previously established and private log-in credentials.  There is no evidence that anyone other than Wood knew his log-in details.  At Wood's deposition on March 24, 2014, taken in connection with this motion, he testified that he terminated his MacHighway account in late January 2014.  (Reply Declaration of David Spears in Further Support of Plaintiff's Motion for Spoliation Sanctions ("Spears Decl.") ¶ 40, May 27, 2014, ECF No. 117.)  This statement was false.

Wood's testimony thus conveniently places his termination of the account just after an important litigation event:  this Court's February 3, 2014 denial of defendants' motion for summary judgment.[13]  (ECF No. 60.)  While defendants argued their dissemination of RFG's written materials was explicitly permitted

---

[13] The Court first indicated it intended on denying summary judgment at the close of the oral argument on the motion, which occurred on January 23, 2014.  (Pl.'s Ex. 7.)

pursuant to the Agreement, the Court determined that questions of fact precluded summary judgment.

The following day, on February 4, 2014, Wood requested that MacHighway immediately terminate his account and deactivate the automatic renewal of the domain name "manhattanadvisers.com". (Pl.'s Ex. 10; see also Spears Decl. ¶ 7.)

MacHighway's records subpoenaed in connection with this motion show that on February 4, 2014, there was a successful log-in using Wood's credentials and instruction to terminate the corporate defendants' account.[14]  Termination of the MacHighway account resulted in the loss of all emails and content on MacHighway's servers relating to the corporate defendants.  (See Reply in Further Support of Plaintiff's Motion for Spoliation Sanctions ("Pl.'s Reply") at 1, May 27, 2014, ECF No. 116.)

Wood offered contradictory explanations for deleting the MacHighway account.  First, on March 18, 2014, Wood's counsel submitted a letter stating that he had terminated the account because he could not afford to pay for it and because RFG was claiming they were still getting "hits."  (ECF No. 72.)  Yet, in his May 16, 2014 affidavit, Wood stated:  "I did not shut down my MacHighway account because I could not afford to pay for it nor because RFG was claiming they were still getting hits.  I do not know [how] those statements were included in the March 18, 2014

---

[14] Wood argues that he terminated the account in late January and that MacHighway's documents indicating otherwise must have been falsified (tr. 62 ("My recollection is that the account was . . . turned off in January.  With as many lies as MacHighway has told, I'm not going to change that opinion based on what they have submitted.")); this is implausible.  Wood failed to provide a single rational, let alone credible, reason why MacHighway would falsify documents in such a manner; as the saying goes, "they don't have a dog in this fight."  This Court discounts entirely – and is troubled by – Wood's testimony on this point.

letter to the Court." (Wood Aff. ¶ 38.) Instead, Wood stated that he terminated the account as part of the process of shutting down his businesses; when he began interviewing for other jobs, he did not want potential employers to see his name affiliated with closed businesses. (Id. ¶¶ 36-38, 41.)

Neither explanation is credible. Maintenance of the account was not more than $4 per month and the account had already been prepaid through April 16, 2014. (Tr. 66-67.) The fact that he did not want to be affiliated with closed businesses when interviewing for new businesses is insufficient to justify the termination of the MacHighway account – this litigation had already commenced and Wood was thus under an obligation not to destroy documents or terminate the existing MacHighway account. The Court is left with the firm conviction that Wood terminated his MacHighway account in order to prevent RFG from obtaining his emails.[15]

On February 19, 2014, Wood had a 37-minute phone call with MacHighway. (Pl.'s Ex. 21.) Following the call, a notation was made in MacHighway's records indicating: "Customer called because he closed a domain a few days ago and

---

[15] Wood has maintained from the outset that he did not believe terminating his MacHighway account would result in the permanent deletion of all his emails. In his affidavit, Wood stated:

> I have closed two businesses in the past. For each one, I disabled the web domain and retained the emails on my computer, which I still have today. Neither occasion required any affirmative action on my part to preserve the emails. Just as I had for these other companies, I planned on preserving Manhattan Advisers' email on my laptop. In other words, when I disabled the domain, I expected I would continue to have access to my Manhattan Advisers' email via my laptop.

(Wood Aff. ¶¶ 41-42.) At the evidentiary hearing, Wood similarly testified that he believed the emails would be accessible on his laptop computer even after he deleted the MacHighway account. (Tr. 65.) This testimony lacked veracity – he contradicted himself and his prior statements; his purported understanding of what would happen when he deleted the account was undermined by his substantial experience as a lawyer and businessman. Moreover, Wood appeared uneasy and unsettled during this portion of his testimony and more generally while on the witness stand.

15

realized the email is sitting on the server.  I let him know that if the account was deleted then so would the emails . . . ."  (Pl.'s Ex. 19.)

On February 24, 2014, when defendants' counsel, Linda Mandel Gates, informed RFG's counsel that defendants "might be 'missing certain emails,'" (Spears Decl. ¶ 11), the parties were already in serious settlement talks.  (Tr. 82; ECF No. 72 (explaining the parties had been engaged in settlement discussions since early February).)  However, on March 5, 2014, counsel for RFG indicated to Gates that "before [we] can continue discussing settlement [] we need to know what happened with [d]efendants' emails."  (Spears Decl. ¶ 18, Ex. 6.)  On March 7, 2014, RFG also noticed a second deposition of Wood.  (Id. ¶ 20; Pl.'s Ex. 13; see also 6/25 Tr. 16.)

Perhaps understanding now that his spoliation was an impediment to settlement that would not be overlooked, Wood took certain actions either to genuinely determine if he could reverse what he had done, or merely to create a more favorable record, or both.

On March 8, 2014 – one day after receiving his deposition notice on spoliation issues – Wood had a three-minute call with MacHighway.  (Pl.'s Ex. 21.)  That same day, Wood emailed MacHighway and requested that his erased emails be restored.  (Spears Decl. ¶ 21.)  Wood wrote:  "I deleted my domain (manhattanadviers.com) . . . and my emails disappeared.  If there is any way to get the emails back for my account from a backup, I need them desperately and will be glad to pay for your time.  Please help me get these emails back on."  (Pl.'s Ex. 14.)  He followed up:  "To clarify; I need the historic emails.  Please help me."  (Id.)

16

Wood received a response from MacHighway that stated it only keeps daily backups.  (Id.)  In response, Wood wrote:  "Is there anything you can do?  I'm desperate."  (Id.)  A technical support representative apologized but said that there was no way to recover the deleted emails.  (Id.)

On March 14, 2014, RFG filed a motion for a Local Rule 37.2 conference to address issues relating to the document destruction.[16]  (ECF No. 68.)  After receiving defendants' response to RFG's allegations on March 18, 2014, (ECF No. 72), the Court issued an Order on March 19, 2014 directing Wood and/or a corporate representative to appear for a deposition within 72 hours.  (ECF No. 76.)  The Court further Ordered:  "Mr. Wood and/or defendants shall immediately take any and all steps to obtain whatever information may still exist with the third party vendor relating to electronic materials.  The Court considers this issue quite serious and if these materials are not recoverable, severe sanctions may be imposed."  (Id.)

On March 24, 2014, RFG deposed Wood.  (Alden Decl. ¶ 40.)  During his deposition, Wood testified that he had email communications with MacHighway about his inability to access emails he had downloaded from MacHighway onto his own computer, which he sought to produce as part of discovery.[17]  (Alden Decl., Ex. A. at 57-58.)

MacHighway's records do not, in fact, reveal any communications on this topic until the day after Wood's deposition.  On March 25, 2014, Wood emailed MacHighway stating that while he could see his old emails on his computer, he

---

[16] That same day, Gates filed a motion to withdraw.  (ECF No. 65.)
[17] This, of course, contradicts Wood's testimony that he had previously manually deleted all of the emails on his computer that he could find.

could not access their content.  (Pl.'s Ex. 14.)  He wrote:  "Can [you] explain how it is that I can see my emails in my Microsoft Outlook but I can't read the actual content of the messages?  Also do you know of any way in which the actual content of the emails can be retrieved?"  (Id.)

This email exchange reflects efforts by Wood to create a "helpful" record. According to RFG, Wood represented to MacHighway that he could partially access the emails in an attempt to later create the impression that he had recovered the deleted emails.

### 3.  "Reactivation" and Second Termination of MacHighway Account

On March 31, 2014, the Court held a conference regarding RFG's assertion that Wood has engaged in intentional spoliation.  (ECF No. 97.)

Later that day, Wood attempted to log in to his manhattanadvisers.com account and could not do so.  (Pl.'s Ex. 10.)  Thereafter, he requested his login details from MacHighway and reset his password.  (Id.)  Wood then had a 19-minute phone call with MacHighway.  (Pl.'s Ex. 21.)  Wood claims that during this phone call, he spoke with someone who "listened to what happened and said he could check to see if there were any backups."  (Wood Aff. ¶ 44.)  "After only a few seconds, he said he found a backup and that it would take about [10] minutes to restore my account.  Just as he had indicated, my account (web site and email) was restored after about [10] minutes."  (Id.)  Despite Wood's account, MacHighway has steadfastly maintained that the recovery Wood describes is not technically feasible and that they cannot identify the person with whom Wood claims to have spoken.

(Pl.'s Ex. 20; Declaration of Afsaan Saleem ("Saleem Decl.") ¶ 34, May 16, 2014, ECF No. 110.)

While Wood did, in fact, reactive his manhattanadvisors.com account, the evidence reveals that he intended this reactivation to be short-lived.  Minutes after reactivating his account, Wood affirmatively submitted an "Automatic Cancellation Requested for End of Current Cycle."  (Pl.'s Ex. 21.)  That is, he reactivated his account only to set it up for automatic termination at the end of the prepaid period, which was less than a month later, on April 17, 2014.

There is no credible evidence that the reactivated account somehow brought back into existence any of the now-long deleted emails.  The only evidence is to the contrary – MacHighway has stated that the once deleted emails were gone forever.  Reactivation simply meant that Wood could use what was – at the moment of reactivation – an empty account.  It had no historic files.

There is, however, evidence that after reactivation some emails did make their way into that account.  The credible evidence does not support "recovery" of the previously deleted emails, but rather, selective "repopulation" by Wood himself.

Wood's testimony regarding the <u>content</u> of the reactivated account also contradicted itself.  First, he testified that, despite MacHighway's technical assertion that the deleted emails were gone forever, he was able to access his emails again following reactivation of the account.  That is, Wood testified that he regained access to the emails that were on the account at the time of the initial account termination months earlier.  Later, Wood conceded that he himself had manually repopulated his reactivated account with emails he was able to obtain from an

addressee of his earlier emails, Justin Cho.  This was consistent with MacHighway's explanation.  "MacHighway's only explanation was that Mr. Wood had somehow uploaded the files onto MacHighway's web portal by dragging and dropping a backup he maintained on his computer." (Saleem Decl. ¶ 30.)  Wood had additional telephone calls with MacHighway (also on March 31, 2014).  (Id.)  About 20 minutes after his last phone call, he emailed MacHighway stating:  "There are only a few items in my sent items folder.  If there is any way to fix this, that would be great." (Pl.'s Ex. 21.)  About an hour and 15 minutes later, a MacHighway representative emailed:  "[I]t would be unlikely that the sent items are available, were they in the manhattanadviers.com account?"  (Id.)

On April 2, 2014, plaintiff's newly-hired counsel, Afsaan Saleem, emailed RFG's counsel stating that MacHighway had been able to "restore" defendants' emails and webpages.[18]  (Spears Decl. ¶ 45.)  This was untrue, though the Court has no reason to believe Saleem knew of that fact.  The "recovered" emails were a selection of Cho's emails, which Wood had placed into the account.

On April 7, 2014, Wood emailed MacHighway Technical Support:  "None of my DNS settings are showing up for manhattanadvisers.com.  Can someone please fix this?" (Pl.'s Ex. 21.)  A handful of different technical support staff communicated with Wood about the issue over the course of the next few days.  (Id.)  On April 9, 2014, Wood wrote:  "Thank you.  I see it now.  Hopefully, I can make this work.  Trying to redirect the web site, but not the email."  (Id.)

---

[18] On March 26, 2014, Afsaan Saleem began representing Wood.  (ECF No. 81.)  On June 3, 2014, Hyder Abbas Naqvi replaced Saleem as counsel.  (ECF No. 120.)  On July 18, 2014, the Court granted Naqvi's request to be relieved as counsel.  (ECF No. 143.)

On April 14, 2014, defendants produced to plaintiff, <u>inter alia</u>, 800 email files and 30 documents that were attached to the emails.  (<u>Id.</u> ¶ 20.)  Saleem represented to RFG that these documents were "recovered" from the MacHighway account. (Saleem Decl. ¶ 21.)  Wood stated in his affidavit:  "The emails plaintiff claims have been deleted by defendants have not been as they have been produced to [p]laintiff." (Wood Aff. ¶ 48.)  Neither of these statements was true, as there had been no "recovery" of that which had been deleted; moreover, while Wood found that Cho was a source he could use to obtain replacement copies of some of the emails, there is no way to know how many emails Cho did not have.  It is unclear, for instance, which of the various emails that Wood had sent to third parties Cho received (and which might therefore have been chosen for repopulation), and which he had not. There was also testimony from Wood himself that Cho would not have received his "individualized" emails to third parties – and thus any repopulation of the manhattanadvisers.com account could not have included those.  Finally, Wood eliminated any ability for RFG to check the validity of his initial assertion of "recovery" as – per his instruction to MacHighway – the account automatically expired just a few days later, on April 17, 2014.  Thus, as of April 17, 2014, the MacHighway account and its contents were deleted intentionally a second time, against resulting in the permanent deletion of all electronic documents contained therein.  (6/25 Tr. 25.)

    4.  <u>Wood's Attempt to Transfer Blame</u>

Following the second termination of his MacHighway account, Wood had a number of email communications with MacHighway.  Taking the evidence as a

whole, this was an attempt to create a false record and transfer blame from Wood to MacHighway and to minimize his personal culpability.

On May 5, 2014, Wood emailed a technical support manager at MacHighway: "I cannot access the cPanel.  Please advise." (Pl.'s Ex. 21.)  The technical support manager responded that because the account was cancelled, "there's no cPanel to login to." (Id.)  In response, Wood wrote:  "That's not the case.  This account is involved in litigation, and it needs to be turned on now!  I am copying my attorney. This needs to be escalated immediately!" (Id.)  With this message, Wood intended to create the later impression that the impermissible deletion of the account was the fault of MacHighway, rather than Wood.  Yet, Wood himself had purposefully set the account to automatically expire at the conclusion of the prepaid period.

The technical support manager then wrote:  "This account was cancelled on 2/14/14 [sic] by someone logging in to your billing area with the correct credentials at the time.  The account is gone (per your request) and has been since that time." (Id.)  In response, Wood forwarded his April 2014 communications with MacHighway Technical Support that indicated he had obtained access to the email system and stated, "This was on in April!" (Id.)  He then wrote, "I just sent an email showing that the account and email were accessible in April.  Please escalate this immediately.  Your company has destroyed email involved in a litigation.  This is a serious matter." (Id.)

In fact, the chronology and various statements by MacHighway personnel demonstrate that Wood knew that he was actually forwarding emails he had used

to repopulate the account – he had never recovered the emails deleted from the

account in the first place.

The President of MacHighway wrote to Wood:

> If you are referring to the account for
> manhattanadviers.com, that hosting package was
> terminated on our servers on 2/5/14 as per client request.
> That means that on that date all client data under the
> hosting package "manhattanadviers.com" was deleted
> (including, but not limited to website files, email
> messages) and all client access removed (including, but
> not limited to website and email accounts).  That hosting
> package and any associated data has not existed since
> then.  We can[]not be of any further assistance on this
> matter.

(Id.)  Two minutes later, Wood forwarded an additional piece of the April 2014 email

chain and wrote, "More evidence.  Please confirm you have escalated."  (Id.)  He also

responded to Graves:  "The account was up and running in April.  Why was it

turned off?"  (Id.)  Five minutes later, Wood wrote:  "This was turned off after you

had notice of pending litigation.  My attorney will be in touch to sort this out

tomorrow.  I'd hate to find out that you turned off the account to make your

submitted statements true."  (Id.)  Ten minutes later, Wood forwarded a series of

emails he purportedly received in April 2014 to his email and wrote to Graves:

"How do you explain all of the email I have sent and received at my

manhattanadvisers.com email address?  My attorney and I copied web pages and

emails during April.  Don't tell me you can't help me.  Destroying evidence during

pending litigation is a serious matter."  (Id.)  This chronology – combined with

Wood's complete lack of credibility – evinces Wood's ongoing attempts to cover up

his own wrongdoing.  Wood argues that MacHighway deleted his account without

23

authorization.  This defies logic.  Wood has proffered no evidence or rationale why MacHighway would have improperly deleted materials from Wood's account.  It similarly had no reason to terminate an account, without warning, on its own accord.  And it certainly had no reason to lie about what it has and has not deleted. The same cannot be said for Wood.

Based on the evidence, along with Wood's demeanor and lack of credibility while testifying, this Court finds that Wood intentionally manually deleted emails, terminated his MacHighway account, and then once he realized he was caught, reactivated his account so that he could upload certain emails and produce them to plaintiff; he then intentionally instructed MacHighway to allow his account to expire again.  (6/25 Tr. 31.)

Correspondence from MacHighway effectively articulates several of the issues; on May 12, 2014, counsel for MacHighway emailed defendants' counsel the following:

> Once again, our position remains the same:  the emails and web content in the subject hosting accounts were overwritten within a week of Mr. Wood's terminating them; they are not recoverable by our system or from our servers.  If Mr. Wood made a back-up as he promised under the Terms of Service, the emails should be available to him. . . .  No one at MacHighway has any idea how his emails were "recovered" on March 31.  We have only your word it occurred.  The question is, if Mr. Wood's emails were again available on March 31, 2014, why didn't he make a back-up then?
>
> According to your comments, he was able to access the previously "lost" email account for 17 days and yet, he failed to save or back up anything.  Why you believe MacHighway has any responsibility to Mr. Wood now [or, in fact, once he instructed – and subsequently twice

>confirmed – MacHighway to terminate his hosting
>accounts "immediately"] mystifies me.

(Pl.'s Ex. 17 (emphasis in original).)

III.    LEGAL STANDARD FOR SPOLIATION

"Spoliation is the destruction or significant alteration of evidence, or failure

to preserve property for another's use as evidence in pending or reasonably

foreseeable litigation." West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (2d

Cir. 1999). "The obligation to preserve evidence arises when the party has notice

that the evidence is relevant to litigation or when a party should have known that

the evidence may be relevant to future litigation." Fujitsu Ltd. v. Fed. Exp. Corp.,

247 F.3d 423, 436 (2d Cir. 2001).

To support the imposition of sanctions, "the innocent party must prove the

following three elements:  that the spoliating party (1) had control over the evidence

and an obligation to preserve it at the time of destruction or loss; (2) acted with a

culpable state of mind upon destroying or losing the evidence; and that (3) the

missing evidence is relevant to the innocent party's claim or defense." Pension

Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 685 F. Supp. 2d 456,

467 (S.D.N.Y. 2010), abrogated on other grounds by Chin v. Port Auth. of N.Y. &

N.J., 685 F.3d 135 (2d Cir. 2012); see also Residential Funding Corp. v. DeGeorges

Fin. Corp., 306 F.3d 99, 107 (2d Cir. 2002).

"The determination of an appropriate sanction for spoliation, if any, is

confined to the sound discretion of the trial judge, and is assessed on a case-by-case

basis." Fujitsu Ltd., 247 F.3d at 436.  (citation omitted).  A spoliation sanction

"should be designed to: (1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and (3) restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Id.

## IV. SPOLIATION ANALYSIS

### A. Wood Had Control Over and a Duty to Preserve the Evidence

"Under Rule 34(a), parties may request from their adversaries documents . . . 'which are in the possession, custody[,] or control of the party upon whom the request is served." In re NTL, Inc. Sec. Litig., 244 F.R.D. 179, 195 (S.D.N.Y. 2007) (quoting Fed. R. Civ. P. 34(a)). "'The concept of 'control' has been construed broadly."' Id. (quoting In re Flag Telecom Holdings, Ltd. Sec. Litig., 236 F.R.D. 177, 180 (S.D.N.Y. 2006)).

RFG filed this lawsuit on April 15, 2013. Wood's preservation obligation attached at least as of that date. See Fujitsu, 247 F.3d at 436 ("The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."). Arguably, under the particular circumstances of this case, the duty to preserve attached as of Wood's receipt of the cease-and-desist demand. See Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d 409, 430 (S.D.N.Y. 2009) ("Where copyright infringement is alleged, and a cease-and-desist demand issues, such a letter triggers the duty to preserve evidence, even prior to the filing of litigation.").

"The scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 216 (S.D.N.Y. 2003).  There is no question that Wood himself exercised personal control over both the computer from which he manually deleted emails and the MacHighway account.

B. Relevance of the Spoliated Evidence

Lost but irrelevant evidence is of little concern to the Court.  Spoliated relevant evidence, however, may well impact resolution of a case.  A party seeking to prove a fact essential to a claim or defense may be deprived of the very evidence needed.  Spoliation of relevant evidence can therefore prejudice the party who is not responsible for the spoliation.  In some cases, spoliated evidence may be of such a nature and scope that its destruction irreparably impacts a full, fair, and just resolution of the case.

The question here, then, is whether the evidence Wood spoliated was relevant.

The Court has found that the emails Wood deleted were directly relevant to RFG's claims in this litigation.  RFG sent to Wood a series of emails that contained its copyrighted content; Wood then stripped RFG's identifying information from those emails and sent out the content to between 400 and 500 individuals on (at least) 10 to 20 occasions.  Following those "mass" emails, Wood engaged in individualized email communication with various recipients – setting up meetings

and the like.  If defendants had been able to produce all of the emails sent or received by Wood relating to the issues in this matter, the scope of Wood's conduct would have been established.  RFG would have evidence of any ill-gotten gains; it might be aware of whether its own clients were among the recipients of Wood's emails, and whether that impacted those clients' views of RFG.  Without these emails, RFG is clearly prejudiced.  It is impossible to know with any certainty who received Wood's emails, when, under what circumstances, and what commentary there was about it (for instance, Wood proffering authorship, etc.).

"When evidence is destroyed in bad faith, that fact alone is sufficient to support an inference that the missing evidence would have been favorable to the party seeking sanctions . . . ."  Orbit Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 440 (S.D.N.Y. 2010); see also In re Pfizer Inc. Sec. Litig., 288 F.R.D. 297, 315-16 (S.D.N.Y. 2013).  Here, there is more – the deleted emails were the best and most complete evidence of Wood's conduct.  They were relevant and should have been maintained.

C.  Wood's State of Mind

A finding of spoliation requires a culpable state of mind.  Pension, 685 F. Supp. 2d at 467.  "In this circuit, a 'culpable state of mind' for purposes of a spoliation inference includes ordinary negligence.  This standard protects the innocent litigant from the destruction of evidence by a spoliator who would otherwise assert an 'empty head, pure heart' defense."  Orbit One Commc'ns, 271 F.R.D. at 438 (citing Residential Funding, 306 F.3d at 108).

"It makes little difference to the party victimized by the destruction of evidence whether that act was done willfully or negligently."  Residential Funding, 306 F.3d at 108; see also Mastr Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc., 295 F.R.D. 77, 84 (S.D.N.Y. 2013) (quotation marks and citation omitted); Taylor v. City of New York, 293 F.R.D. 601, 612 (S.D.N.Y. 2013) ("A party is found to have acted with a sufficiently culpable state of mind [to warrant sanctions] when evidence was destroyed knowingly, even without intent to breach a duty to preserve it, or negligently.") (emphasis, internal quotation marks, and citation omitted); Sekisui Am. Corp. v. Hart, No. 12 Civ. 3479, 2013 WL 2951924, at *3 (S.D.N.Y. June 10, 2013) (citing Residential Funding, 306 F.3d at 108); accord Usavage v. Port Auth. of N.Y. & N.J., 932 F. Supp. 2d 575, 590 (S.D.N.Y. 2013) ("[W]hen evidence is destroyed intentionally or willfully, that fact alone is sufficient to demonstrate relevance and favorability."); Burgos v. Satiety, Inc., No. 10 Civ. 2680, 2013 WL 801729, at *5 (E.D.N.Y. Mar. 5, 2013) ("Granting a dispositive motion based on an adverse inference . . . can be appropriate when bad faith and willfulness is demonstrated and there is no other remedy available." (citations omitted)); Antonmarchi v. Consol. Edison Co. of N.Y., Inc., No. 03 Civ. 7735, 2012 WL 3126004, at *2 (S.D.N.Y. July 31, 2012) (sanction for spoliation appropriate where plaintiff "engaged in willful and repeated misconduct"); Arista Records LLC v. Usenet.com, Inc., 608 F. Supp. 2d at 439; Miller v. Time-Warner Commc'ns, Inc., No. 97 Civ. 7286, 1999 WL 739528, at *2 (S.D.N.Y. Sept. 22, 1999).

In this case, the evidence illustrates that Wood acted intentionally and in bad faith.  Wood is a licensed attorney who undoubtedly was aware of the basic

document retention requirements in play during litigation. Even that training

aside, Wood was clearly on notice of the relevance of the electronic documents both

before and after the litigation was filed. It was evident from the outset of this

litigation that in order to resolve RFG's allegations, an examination of the materials

disseminated by Wood would be required. Wood deleted every relevant email he

could find. He deleted items from his email archives, from his sent mail, from his

deleted mail, and just to ensure there was no way to recover the materials, from the

server on which relevant emails were stored, twice.

The record, along with Wood's demeanor during his testimony at the

evidentiary hearing, makes clear that Wood purposefully destroyed documents to

avoid liability. He did so knowingly and intentionally, and then tried to cover it up.

This clearly constitutes bad faith.

V.     SANCTION

    A.  Legal Framework

"[A] court should always impose the least harsh sanction that can provide an

adequate remedy." Pension, 685 F. Supp. 2d at 469. "The choices include – from

least harsh to most harsh – further discovery, cost-shifting, fines, special jury

instructions, preclusion, and the entry of default judgment or dismissal

(terminating sanctions)." Id. A terminating sanction is a "drastic remedy" that

"should be imposed only in extreme circumstances, usually after consideration of

alternative, less drastic sanctions." West, 167 F.3d at 779 (internal quotation

marks omitted); see also Pension, 685 F. Supp. 2d at 469-70 ("[A] terminating

sanction is justified in only the most egregious cases, such as where a party has

engaged in perjury, tampering with evidence, or intentionally destroying evidence by burning, shredding, or wiping out computer hard drives.").

Cases in which courts have considered terminating sanctions are instructive. For example, in Gutman v. Klein, the court issued a terminating sanction where defendant's laptop was found by "a consulting and technical services firm specializing in digital forensics, computer crime response, electronic discovery, and the preservation, analysis, and production of electronic data" to have been tampered with during discovery.  No. 03 Civ. 1570, 2008 WL 4682208, at *3-5 (E.D.N.Y. Oct. 15, 2008), report and recommendation adopted by 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008), aff'd, 515 F. App'x 8 (2d Cir. 2013).  Specifically, hundreds of documents had been deleted hours before the laptop was to be produced for forensic imaging. Id. at *4.[19]  In Metropolitan Opera Association, the lead defendant engaged in, inter alia, all of the following misconduct:  it represented to the court that it had conducted a thorough search of documents when it had not done so; it failed to implement a document retention policy or to explain document retention procedures to relevant employees; it represented to the Court that it would attempt recovery of deleted emails and subsequently failed to do so; it misrepresented a witness's vacation schedule in order to delay the witness's court-ordered deposition; it concealed the existence of certain relevant documents; and, after learning that plaintiff sought to conduct a forensic analysis of defendant's computers, it replaced those computers without notice.  Metro. Opera Ass'n, Inc. v. Local 100, Hotel Emps.

---

[19] Defendant also testified during the spoliation hearing that a thief had stolen another, not previously mentioned laptop, which contained evidence relevant to the litigation; the court rejected this testimony as lacking credibility.  Gutman, 2008 WL 4682208, at *10-11.

& Rest. Emps. Int'l Union, 212 F.R.D. 178, 181-182 (S.D.N.Y. 2003).  Here again, the court imposed a terminating sanction.  Id. at 231.

In contrast, in Harkabi v. SanDisk Corp., the Court refused to grant a terminating sanction.  275 F.R.D. 414, 419 (S.D.N.Y. 2010).  While the court determined that the defendant had made "a cascade of errors" in its document retention and production efforts that ultimately "aggregated to a significant discovery failure," each individual error was "relatively minor."  Id.  Notably, the Court held that there was "no evidence that [the defendant] engaged in egregious conduct such as the intentional destruction of evidence."  Id. at 420; see Arista Records LLC v. Usenet.com, Inc., 633 F. Supp. 2d 124, 139 (S.D.N.Y. June 30, 2009) (refusing to impose a terminating sanction despite the fact that "[p]laintiffs' evidence credibly illustrates a pattern of destruction of critical evidence, a failure to preserve other relevant documents and communications, and at best dilatory (and at worst, bad-faith) tactics with respect to [d]efendants' conduct during discovery").

B. Analysis

RFG has clearly been prejudiced by Wood's intentional spoliation.  The Court has considered whether sanctions less severe than termination are warranted.  For example, the Court has considered monetary sanctions or the imposition of an adverse inference.  Neither would be sufficient under the circumstances.  The lack of emails prevents RFG from proving the full extent or scope of Wood's conduct.

Wood's deletion of emails and his attempted cover-up put RFG in an untenable litigation position – the evidence of the scope of defendants' alleged misconduct is gone forever.  Any sanction short of a terminating sanction would fail

to account for the prejudice or to sufficiently penalize Wood or deter others from engaging in such misconduct.  Accordingly, the Court grants RFG's request for a terminating sanction.  See, e.g., Miller v. Time-Warner Commc'ns, Inc., No. 97 Civ. 7286, 1999 WL 739528, at *2-4 (S.D.N.Y. Sept. 22, 1999) (dismissing the Complaint where the plaintiff "deliberately erased handwritten notes she made on various documents during the course of her employment . . . in an attempt to prevent the defendants from discovering this information" and later committed perjury when asked about the conduct).

VI.    CONCLUSION

For the foregoing reasons, RFG's motion for sanctions is GRANTED.  The Clerk of Court shall close all open motions and enter judgment in favor of plaintiff.

The Court will consider an award of reasonable attorneys' fees incurred in litigating this action, including with respect to this motion.  RFG is ORDERED to provide a submission detailing the fees incurred, along with contemporaneous billing records, if possible, not later than **August 22, 2014**.

SO ORDERED.

Dated:     New York, New York
           August  5  , 2014

_____
           KATHERINE B. FORREST
           United States District Judge