E6PTREGA

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  THE REGULATORY FUNDAMENTALS
   GROUP LLC,
4
                Plaintiff,
5
                v.                         13 CV 2493 (KBF)
6
   GOVERNANCE RISK MANAGEMENT
7  COMPLIANCE, LLC, et al.,

8                Defendants.

9  ------------------------------x
                                      New York, N.Y.
10                                    June 25, 2014
                                      10:00 a.m.
11
   Before:
12
                      HON. KATHERINE B. FORREST,
13
                                      District Judge
14
                           APPEARANCES
15
   SPEARS & IMES
16      Attorneys for Plaintiff
   BY:  DAVID SPEARS
17
   AHMAD NAQUI RODRIGUEZ, LLP
18      Attorneys for Defendants
   BY:  HYDER NAQUI
19

20

21

22

23

24

25

E6PTREGA

1              (Case called)

2              THE COURT:  Good morning.  We're here for oral

3    argument on plaintiff's motion relating to spoliation, and I

4    think that's the only item on the agenda.  We had otherwise

5    closed the evidentiary record subsequent to our last hearing.

6    There was an agreement by the defendant to waive the

7    attorney/client privilege in the limited manner in which the

8    Court had described on the transcript at the last hearing, and

9    the transcript should have been unsealed.

10             And Mr. Spears, you should have received a copy of it

11   or been able to, I should say, get a copy of it of the unsealed

12   portion.  Were you able to?

13             MR. SPEARS:  Yes, I was.  Thank you very much.

14             THE COURT:  Terrific.  So if there's nothing else in

15   terms of evidentiary matters, we should go ahead straight into

16   the argument.  And Mr. Spears, since it's your motion, I will

17   let you go ahead and begin.

18             MR. SPEARS:  Thank you.  Your Honor, as a preliminary

19   matter I would like to hand up to the Court four demonstrative

20   exhibits that are, in effect, timelines that capture different

21   pieces of what I'm going to be arguing about.  I request that

22   these be marked for the record as 22, 23, 24 and 25, and I

23   intend to refer to them during my summation.

24             THE COURT:  All right.

25             MR. SPEARS:  And I provided those to counsel

1    yesterday.  We made one change after they were provided to him,

2    I just gave him a revised copy that had that one change on

3    them.

4              THE COURT:  All right.  So Mr. Naqui, I take it that's

5    an accurate representation, you have seen these?

6              MR. NAQUI:  That is an accurate representation, your

7    Honor, I have seen them.  My only slight objection to them

8    would be to the extent that some of these timeline entries

9    summarize testimony or anything like that, that testimony,

10   along with what was presented to the Court in the hearing a

11   couple weeks ago, is on the record and in and of itself, to the

12   extent these characterize the testimony in some way, I object

13   to that.

14             THE COURT:  Understood.  The testimony is the evidence

15   in the case, and that is reflected in the transcript.

16             Similarly, the quotations from the documents, the

17   documents that have been previously admitted as part of the

18   evidentiary record are the evidence, but the Court will use

19   these as a demonstrative to the extent they go to these

20   matters.

21             You made proceed, Mr. Spears.

22             MR. SPEARS:  Thank you, your Honor.  There are two

23   distinct pieces to this case in terms of our perspective in

24   terms of spoliation.  One is the manual deletion of emails by

25   Mr. Wood, and the other is the termination of the account at

E6PTREGA

MacHighway.  And the demonstratives actually have do with the

MacHighway issue.  I'm going to start with the deletion, the

manual deletion of the emails, and address that.  I do not have

a demonstrative for that, but it's not lengthy, what I have to

say isn't lengthy.

          Mr. Wood testified in this hearing, on the June 10

hearing, consistent with his deposition testimony that after he

received the cease and desist order and after he received the

May 17, 2013 letter from our firm to the Court complaining

about ongoing hits to RFG's Web site, and after his June 3,

2013 deposition, he manually deleted emails, that is, when I

refer to transcript, I will be refer to the June 10 transcript

that is transcript page 36.  What he deleted was the sent

emails that he had sent to recipients containing RFG

copyrighted material that he had created infringing copies of.

He estimated that there were 10 to 20 of those emails that he

sent to recipients.  That is at transcript 36 to 37.

          Those sent emails had a distribution list in the BCC

field of 400 to 500 recipients who were on his distribution

list.  That is at transcript 38 to 39.  He deleted those sent

emails from his sent box over a period of time.  In particular,

after his deposition on June 3, 2013, he went back and deleted

more, that is at transcript 42 to 43.  And at the time of the

deposition, on June 3, 2013, he was aware of the May 31, 2013

document request from plaintiff.  That is at transcript 48.

1          When he deleted the emails from his sent box with the

2     distribution list in the BCC field, he double deleted those

3     emails.  He has testified that the purpose of this exercise in

4     deletion was to remove all possibility of any further

5     accusation that he was the cause of any hits that RFG was

6     experiencing to its Web site were linked to the copyrighted

7     material that it had sent to them that had links in it.  That

8     is at transcript 42 to 43 and 50.

9          Your Honor, we believe that is simply not credible and

10     should be rejected as not credible for the following reasons,

11     among others:  A, he never told his counsel that he had deleted

12     these emails from his sent box in order to protect himself

13     against accusations of being responsible for these hits.  If

14     his purpose was to insulate himself from such accusations, he

15     should have announced it so as to remove all doubt that any

16     further hits were from him.  It's also incredible because

17     deleting the emails with the links in them from his sent box

18     would not affect those same emails in the hands of the 400 to

19     500 people on his distribution list.  It would have no affect

20     on that.

21          Similarly, deleting those emails from his sent box

22     would not affect the same emails as they existed in his inbox.

23     He said that he copied himself on his distribution list in the

24     CC field, BCC field, so that he had a copy of the email too,

25     and to the extent that that email existed in his inbox, he

E6PTREGA

1  would still be subject to the same accusation, if one credits

2  his logic.  He also testified that he had trouble understanding

3  why those emails in the sent box would even be relevant, and

4  why it wouldn't be okay to delete them because he had been

5  transparent in the litigation about what he had done and that

6  was something he received from RFG, so they already knew about

7  it.

8       I mean that is not only inconsistent with any sort of

9  expression of remorse or regret, it's sort of a double down and

10  saying actually I am not sure there was anything wrong with

11  this because these emails weren't relevant.

12       The only possible purpose of the deletions was to get

13  rid of all evidence of the persons and entities to whom he had

14  sent the infringing copies of plaintiff's copyrighted material.

15  And we submit to the Court that there can be no other inference

16  drawn as to why those emails were deleted.

17       THE COURT:  And let me ask, do you know whether or not

18  the entity's names were included on the BCC, through some form

19  of manual entry into the BCC line or whether there was a group

20  function that was used to distribute them?  Because if it was a

21  group function, then presumably on the computer there would

22  still be the group.  And so while you might not have the

23  emails, you might nonetheless have the names, at least the

24  email addresses of the group.

25       MR. SPEARS:  I do not know the answer to that, your

E6PTREGA

1    Honor.  I know that there have been discussions about getting

2    the distribution list that he presently has.  We cooled on that

3    idea because at this point we're not willing to take Mr. Wood's

4    word for what was and was not on that distribution list as

5    reflected in the BCC field.  And it strikes us as

6    counterintuitive that he would have deleted all that and then

7    be willing to provide us with a complete list of those names.

8              THE COURT:  I think in addition from the testimony,

9    Mr. Naqui will have an opportunity to address all of this, the

10   10 to 20 emails were the group emails, if you will, they did

11   not include, as I understood Mr. Wood's testimony, the

12   individualized back and forth that might have been triggered by

13   an addressee's receipt of an email.

14             So for instance, if somebody said I would like to get

15   together with you for a meeting or luncheon, and he wrote back

16   and said terrific, I will be around on X day, that kind of

17   communication wouldn't necessarily -- would not be within the

18   10 to 20, it would be a different communication, but it would

19   have been within the group of emails that were deleted.

20             MR. SPEARS:  I believe that's right.  And I believe

21   further, your Honor, if they weren't manually deleted, they

22   were lost for all time when he terminated the MacHighway

23   account where presumably any such emails that had not been

24   deleted would have been in an inbox, a deleted folder file, or

25   a sent folder.  So we know what he manually deleted to some

E6PTREGA

extent because he told us.  If he didn't delete the back and

forth with any back and forth people manually, then it was lost

forever when he terminated the MacHighway account.

        And it seems to us, your Honor, there could be replies

such as "I'm interested, let's get together," there could have

been replies such as "I'm marketing this for you, I'm working

with you on this, I have interest from people," we would know

nothing about those.  They could reflect -- emails that we

won't have access to could reflect communications about the

actual receipt of revenue.  Mr. Wood testified that he did not

receive revenue, but we're simply not willing to take his word

about that.

        I also note that the emails and the distribution list

as actually sent are of enormous interest to us, because it

could have had a negative impact on plaintiff, namely if they

were -- if their actual customers got it, were on the

distribution list, the customers could have said:  Why am I

paying RFG for this stuff when I could get it apparently from

Manhattan Advisers from Mr. Wood for free?  Or potential RFG

customers may have had the same reaction, or potential or

actual customers may have thought to themselves, well, RFG

represented to me they have this very special proprietary

product that they invested a lot of time and effort in

creating, but it looks like it's all over the place, other

people have the same material and maybe they're not telling us

E6PTREGA

1    the whole story about their product and what it is we're paying

2    a subscription for.

3              THE COURT:  All right.

4              MR. SPEARS:  Your Honor, I would like to go on to the

5    MacHighway and to refer the Court respectfully to the

6    demonstratives.  Demonstrative Exhibit 22 is a one-page exhibit

7    with the heading:  Greg Wood Canceled MacHighway Accounts.

8              THE COURT:  I have it in front of me.

9              MR. SPEARS:  So January 23 we had oral argument on the

10   summary judgment motion.  On January 27 Mr. Wood reset his

11   MacHighway password after multiple attempts at logging in.

12   That's in the MacHighway log.  On January 28 plaintiff's

13   counsel emailed defendant's counsel attaching the May 31, 2013

14   document request and noting that, based on the oral argument

15   and your Honor's comments at the oral argument, we would expect

16   to receive production pursuant to those shortly after the

17   Court's ruling.

18             On February 2, 2014, Mr. Wood received a renewal

19   notice from MacHighway for roxboroughwood.com, a different

20   email account that he maintained with a lawyer colleague named

21   Claude Roxborough.  He responded to MacHighway not to renew the

22   account, and we see that on the log, and I want to go to the

23   log in just a minute.  On February 3 the Court issued the order

24   denying defendant's motion for summary judgment.

25             And I would like to go to the log at Exhibit 10.  And

E6PTREGA

1    we gave the Court a binder of the exhibits, and I have given it

2    to counsel for the defendants as well.

3             THE COURT:  Yes.

4             MR. SPEARS:  There was a little bit of confusion about

5    this in the testimony, Mr. Wood's testimony at the hearing, and

6    I would like to use this opportunity to try to clear that up.

7             If you go to February 2, 2014, not quite halfway up

8    the page, you see created invoice, 27200.  If you look further

9    up, you can see that that relates to the Roxborough Wood

10   account.  So it appears that on February 3, a couple of lines

11   up, Mr. Wood went into that account on MacHighway's servers and

12   canceled the Roxborough Wood service immediately.

13            Then you see the next line up, it's cancel outstanding

14   product renewal invoice.  That's for the hosting service, the

15   email hosting service.

16            Then you go one line up, client disabled auto renew.

17   That's for the domain preservation or maintenance.  And you see

18   here emails sent to Greg Wood, cancellation request

19   confirmation, that's on 2/3.

20            On February 4 Mr. Wood went into -- if you go about

21   four or five lines up, February 4 at 11:13, went into the

22   Manhattan Advisers account and did an automatic cancellation

23   requested immediately.  So that is a cancellation of its

24   account, and at the same time, he disabled the domain auto

25   renew from Manhattan Advisers.  So he cleaned the table with

E6PTREGA

1    regard to Manhattan Advisers as reflected here.  An email was

2    sent to him, it says here, cancellation request confirmation.

3    And if you go up to 2/5/14, the next day at 2:49 it says module

4    terminates successful with a service ID 16796.  That's the same

5    one as the lines below for Manhattan Advisers.

6            So this has him going in on the February 4, one day

7    after the summary judgment ruling was issued, and terminating

8    the Manhattan Advisers account, MacHighway.  Future renew, the

9    hosting service like automatic cancel, right now, and it was

10   scheduled the hosting package was scheduled to terminate on

11   April 16, 2014, that's reflected in other documents that I will

12   go over with the Court.  So he was in the prepaid period, and

13   he affirmatively canceled.

14           He has said that the reason why -- first he said that

15   he did that in January, not February 4, and he has challenged

16   MacHighway's log, computer-generated log, which shows that it

17   was on February 4.  So in his testimony he actually testified

18   that leaving aside the January -- the claim of January

19   cancellation that the way it worked was that he got the

20   Roxborough Wood auto renew, which we can see is February 2, so

21   it reminded him about the Manhattan Advisers account, and he

22   went in after he got the Roxborough Wood notice and canceled

23   the Manhattan Advisers account.  So that happened, the

24   Roxborough Wood events around February 2 and 3, and the

25   Manhattan Advisers events are on February 4 right after, so

E6PTREGA

1    that's consistent with his testimony.

2          He also testified that he's actually not sure when he

3    deleted the Manhattan Advisers account on Roxborough Wood, and

4    I will get that transcript cite and put it on the record.  I

5    thought I jotted it down here, but I didn't.

6          So all of that establishes that he canceled this the

7    day after the summary judgment decision came down.  It's our

8    position that his testimony at his deposition on March 24,

9    2014, that he did it in early January, which was before we --

10   March 24, 2013 was before we had the Manhattan Advisers

11   materials.  And we got them and they show what they show.  He

12   testified, your Honor, that the purpose for terminating the

13   Manhattan Advisers account was that he was applying for jobs,

14   and he didn't want employers to see evidence of another Web

15   site associated with him that he supposedly wasn't involved

16   with anymore.

17         I note, your Honor, that in the materials we received

18   from MacHighway -- Exhibit, the production by MacHighway to

19   defendants, Exhibit 19, and Mr. Wood's telephone and email

20   production reflecting his interactions with MacHighway, that's

21   Exhibit 21.  We see that in April he started anew right around

22   the time when the Manhattan Advisers account burned out for the

23   second time.  He opened a new domain and email hosting service

24   with MacHighway for something called the start-up survivor.  So

25   I think your Honor, that the fact that he opened another domain

E6PTREGA

1    and another account at the same time when he claims to have

2    been shutting everything down because he was walking away from

3    all those other businesses or presences and starting -- looking

4    for a job somewhere else is simply not credible.

5              THE COURT:  Can you show me where the start up

6    survivor domain is referred to?

7              MR. SPEARS:  Yes, if you go to Exhibit 10, it's first

8    reflected here about April 12.  You see new order placed with

9    an order ID number, and then there are a series of entries here

10   about --

11             THE COURT:  I see.

12             MR. SPEARS:  -- invoice payment, and created invoice

13   with a number, continues module creates successful email sent

14   to Greg Wood, credit card payment confirmation.  And if you go

15   to the emails with Mr. Wood, between Mr. Wood and MacHighway in

16   Exhibit 21 that he produced on I think June 6, I think one of

17   the last emails in that pack of materials produced, they sua

18   sponte terminated that account with him and just said we're

19   shutting it down, we'll put a credit on your credit card, and

20   there's a reference there to starting up survivor.com account.

21             In addition, your Honor, I would like to call the

22   Court's attention to Exhibit -- the next MacHighway production,

23   which I think is Exhibit 14.  If you go to the back page of

24   that, your Honor, the very last page, I think it says page 11

25   of 11 at the top.  So this is actually the screen shot that was

E6PTREGA

1    preserved when Mr. Wood canceled the Manhattan Advisers

2    account.  You can see here it has a date on here, at the top it

3    says disusage right under cancellation request notice.  It says

4    last updated 02/04/2014 at 2:01.  That's consistent with the

5    cancellation request.  The product of service it says "small,"

6    which is a reference to a particular hosting package option.

7    It has registration date over at the right in a box, it has

8    next due date, April 17, 2014.  Status, down on the left under

9    password "canceled," that's the option he checked in the box.

10   And if you go down to towards the bottom it says "override auto

11   suspend, do not suspend until," and you can see it's

12   00/00/0000, which means immediate.  So this is actually a

13   screen shot of the screen that he went to to cancel the account

14   and the information that was entered on the screen at that

15   time.

16          THE COURT:  All right.  I see that.

17          MR. SPEARS:  So your Honor, I would like to go to

18   Demonstrative Exhibit 23, which has the heading evidence

19   regarding Greg Wood's destruction of emails at MacHighway and

20   his efforts to restore.  And the phone records which we

21   received from Mr. Wood, which are in Exhibit 21, we see that

22   Mr. Wood had a 37-minute telephone call with MacHighway on

23   February 19, 2014, which would have been from 12:41 p.m.

24   Eastern Standard Time to 1:18 p.m. Eastern Standard Time, then

25   you see the corresponding Mountain Standard Time.  And then at

E6PTREGA

11:18 Mountain Standard Time, which is when that call would

have ended, there's a MacHighway log entry regarding the

telephone call from Mr. Wood to MacHighway, and I would like to

direct the Court's attention to Exhibit 19.

THE COURT:  So I'm clear, this is to address the point

that there was not only this phone call, but that there was not

a different phone call?

MR. SPEARS:  As to our position that there was not a

different phone call, we note that there is no evidence of a

different phone call.  It's a question of proving a negative.

And I simply rely on the absence of evidence -- contrary

evidence in that regard.

THE COURT:  Right.  Understood.

MR. SPEARS:  So this log, your Honor, entry was made

at the time when that call ended, and it says customer called

because he closed a domain a few days ago and realized the

email is sitting on the server.  I let him know that if the

account was deleted, then so would the emails.  I got him to go

to -- et cetera, et cetera.

So if you follow down, your Honor, it says that Claude

called in, that's Claude Roxborough, I believe, and if you read

further it appears that this is about the Roxborough Wood

hosting package and domain that had been terminated, and

apparently Mr. Roxborough wanted to take it, but it's clear the

top entry is Mr. Wood, and refers to a topic of conversation in

1      the 37-minute telephone call that he had with him that night.

2      And we interpret this, your Honor, and we ask the Court to

3      interpret it to mean that he called up and asked whether,

4      notwithstanding the fact that he had terminated the account,

5      the emails were still on the account, and he was told by

6      MacHighway no, if the account was deleted, then so were the

7      emails.  So to us it suggests a concern that the emails might

8      be in existence even though he terminated a particular account

9      at MacHighway and he was calling seeking reassurance on that.

10            Then proceeding through the demonstrative, there are a

11     series of entries here that relate to back and forth between

12     plaintiff's counsel and Ms. Gates about defendant's imminent

13     document production, and entries from the privileged log that

14     indicates there were a series of communications between

15     Ms. Gates and Mr. Wood on the topic of documents.  These are

16     privileged, but you can see sort of the momentum going here is

17     we're pressing for the documents.

18            March 5, on page 2, plaintiff's counsel emailed saying

19     that we have to have the emails or know what happened to them

20     before we can proceed with settlement discussions.  March 5,

21     there's a telephone conference between plaintiff's counsel and

22     defendant's counsel regarding the explanation for the missing

23     emails.  Then on March 7, 2014, plaintiff's counsel emailed

24     notices of deposition for each defendant to defendant's counsel

25     with a March 12, 2014 date.

E6PTREGA

1          We then see that there are a series of emails between

2     MacHighway and Mr. Wood that are reflected in Plaintiff's

3     Exhibit 14.  It starts on page 5 of 11 at the bottom, right

4     above the edit and delete box.  And it says posted on Saturday,

5     the 8th of March, at 9:51 I think it says.  Mr. Wood says, "I

6     deleted my domain, manhattanadvisers.com, in January and my

7     email disappeared.  If there's any way to get the emails back

8     from my account from a back up, I need them desperately and

9     will be glad to pay you for your time.  Please get the emails

10    back on" -- I note there it says "January."

11         It's our position that at this point in time Mr. Wood

12    is attempting to make a record in support of the position he's

13    going to take that all this happened in January.  And I will

14    come back to that later, because there are four instances at

15    least where that happened, and I want to discuss those

16    separately.  A short while later he says, "To clarify, I need

17    the historic emails, please help me."

18         If you go -- so then you go over to the very bottom of

19    the next page where MacHighway says, "Thank you for contacting

20    support.  We keep only daily backups, so if this was deleted

21    any more than a day ago, any backups would be gone."

22         About halfway up the page, right above the edit and

23    delete boxes, Mr. Wood says, "Is there anything you can do?

24    I'm desperate."

25         Then you go up a few lines further up and next to the

1   edit and delete boxes MacHighway says, "Hello, Greg, I'm sorry

2   the loss of your email, but unfortunately if the daily backup

3   is not sufficient, we would not be able to provide a backup to

4   restore them," and they provide some information about how you

5   restore a daily back up.

6           If you go to the next page, towards the bottom of the

7   page -- sorry, your Honor, go forward a page, we're working

8   chronologically here.  So it's page 3 of 11.

9           THE COURT:  3 of 11, all right.

10          MR. SPEARS:  Down at the bottom Mr. Wood says right

11  above the edit and delete boxes on the bottom, "Thank you, but

12  I closed the domain, that would not apply.  Do you have a

13  historic back up?"

14          Then you go up to the next edit delete boxes, and

15  MacHighway replies, "Thank you for your reply.  Unfortunately

16  no, we do not have a backup of your account in any form.  If

17  your account was still active you could access the one daily

18  back up that is provided through the C panel.  However, please

19  keep in mind that you, the customer, are responsible to keep

20  backup of your Web site as stated in the terms and

21  conditions."Then there's more information about a backup

22  service that they provide.

23          So your Honor, those are the discussions on March 31,

24  and I will come back to page 2 of 11 a little later, but

25  Mr. Wood was told on March 8 there's no possibility of

E6PTREGA

1    restoring the emails because they were -- when the account was

2    terminated, the emails were deleted, and he described himself

3    as desperate to get the emails.  And in the testimony at the

4    hearing Mr. Wood testified that he was desperate because -- he

5    used the word "desperate" because he was desperate to the

6    settle, and he thought he could not settle the matter until he

7    produced the emails, and he testified that he tried to settle

8    from the beginning and he didn't have the money to fight this

9    action and he just wanted to bring it to an end.

10              Well, I note, your Honor, that the record of the

11   proceeding is completely inconsistent with that.  I mean

12   Mr. Wood filed a motion to dismiss, which is a party's right,

13   obviously, from as soon as he came into the case, did not

14   introduce documents.  We had that June 20 hearing, our

15   conference with the Court where the Court brokered a compromise

16   where we would get some documents for three different

17   recipients, but otherwise they resisted document production.

18   They filed a motion to dismiss, which Mr. Wood attached an

19   affidavit proclaiming his total innocence and claiming that

20   this was all spurious and he had done nothing wrong, and that

21   was converted to a summary judgment motion, as the Court knows.

22   And again, he submitted an affidavit submitting that -- he

23   submitted an affidavit arguing that he had done nothing wrong

24   and his conduct has been lawful and proper at all times.  And

25   he actually sought a finding from the Court that plaintiff had

E6PTREGA

1    to pay his legal fees.  So it is simply not true that he just

2    wanted to settle this from the time started.

3         And I say all that by way of making the point that he

4    was not desperate on March 8 because he wanted the emails to

5    settle.  He was desperate because he had gotten a deposition

6    notice on March 7 calling for his deposition on March 12,

7    pursuant to a ruling -- sorry, that was before the Court

8    intervened on this and he was desperate to try to unwind from

9    the wholesale document destruction he had worked at MacHighway

10   when he terminated the account on February 4.

11        Your Honor, I would like to go to our next

12   demonstrative, which is Demonstrative Exhibit 24, and this

13   relates to Mr. Wood's actions following the March 12

14   deposition -- March 24, 2014 deposition.  At that deposition

15   Mr. Wood testified that -- we have it summarized here, and I

16   know the Court has deposition transcript cites, and we tried to

17   be faithful to the text, and I know that if we have erred or

18   strayed, that will be recognized.

19        He testified at his deposition that he could not open

20   and read the content of the emails that he had downloaded onto

21   his personal computer from the manhattanadvisers.com account at

22   MacHighway before he terminated the account.  In other words,

23   he said I downloaded them but can't open them, I can't

24   understand.  He said that he had been in contact with

25   MacHighway about that issue since February and that he emailed

1    MacHighway about it on March 23.  He further testified that he

2    exchanged a total of five emails with MacHighway about this

3    problem.  If fact, your Honor, we see, if you go back to the

4    log, Exhibit 14, the first page, Mr. Wood says above the edit

5    and delete box on the bottom.

6            THE COURT:  What exhibit?

7            MR. SPEARS:  Exhibit 14, page 2 of 11.

8            This is the day after his deposition on March --

9    sorry, June -- March 24.  He says, "Can you explain how it is

10   that I can see my emails in my Microsoft Outlook but I can't

11   read the actual content of the messages?  Also do you know any

12   way in which the content of the emails can be retrieved?"  So

13   he testified at his deposition that he had -- what he had

14   downloaded was on his computer but there was something wrong

15   with it since he terminated and he couldn't open it, and he had

16   been in contact with MacHighway about that since February, had

17   exchanged as many as five emails about it.  But in fact there's

18   no record that he ever mentioned that issue to them until the

19   day after his deposition when he provided that alibi, if you

20   will, for not producing documents.  There are no prior emails

21   with MacHighway about this, he never raised it at all with them

22   until this time.

23           Afterwards there is a flurry of activities, and if the

24   Court goes to Exhibit 10 again, the Manhattan Advisers log, you

25   can see here it's on -- if you flip through to what's the

1    second page in that physical exhibit, you see a whole series of

2    entries on March 31.

3              THE COURT:  Yes.

4              MR. SPEARS:  So it indicates that he was in contact

5    with MacHighway numerous times on that occasion, on that date,

6    and you see these entries over to the right referring to Amanda

7    M, these more or less correspond to about five or six telephone

8    calls reflected to MacHighway on March 31.  What we do know

9    happened is that the account was reactivated on March 31,

10   because it was still in the prepaid period.

11             And you see here March 31, 1724, email sent to Greg

12   Wood, "Your password has been reset."  So there is a series of

13   entries after that reflecting that -- there is one here, 1748,

14   "Status change from canceled to active, password change."  Then

15   there's an interesting one up here, 3/31/14, four lines down,

16   "Automatic cancellation requested for end of current cycle."

17   So he reactivated, but he asked that the account be canceled as

18   of the end of the cycle, which we saw in the screen shot that

19   was April 17, 2014.  So he reactivated the account with the

20   proviso that it be canceled at the end of the prepaid period.

21             His testimony -- you don't have to go there now, your

22   Honor, but we recorded it here on the second page of this

23   demonstrative exhibit, 8:02 there's a three-minute call from

24   him to MacHighway, 8:04 there's a -- MacHighway emails Mr. Wood

25   transmitting account information, at 8:07 p.m. there's a

E6PTREGA

 1    telephone call from Mr. Wood --

 2              THE COURT:  This is in --

 3              MR. SPEARS:  Demonstrative exhibit, your Honor.

 4              THE COURT:  I see.

 5              MR. SPEARS:  We summarized it there.

 6              THE COURT:  I see.

 7              MR. SPEARS:  So 8:43, a four-minute call from Mr. Wood

 8    to MacHighway, 8:48 a one-minute call from Mr. Wood to

 9    MacHighway.  And he has testified, your Honor, that he spoke to

10    someone there who quickly restored the emails that had been

11    deleted when he terminated the account on February 4, 2014.

12              So this is March 31, about seven week later, on

13    March -- on February 17 in a phone call he was told once these

14    are deleted there's no getting them back, it happens when you

15    close the account.

16              On March 8 he had the extended email chain where he

17    said I'm desperate, I need you to restore these emails.  He's

18    told it's not possible to do that, they're gone.  But he claims

19    on March 31, someone on the phone, they can't say who, quickly

20    restored the emails, and there they were, the emails that had

21    been lost presumably when he terminated the account seven weeks

22    before.

23              Your Honor, we argue that there is simply no inference

24    to be drawn other than the inference that he uploaded materials

25    at this time, that he reactivated the account and uploaded

E6PTREGA

1    materials.  It gets pretty confusing in the testimony as to

2    what happened there.  I mean he testifies that they restored

3    Justin Cho but not his.  Frankly I wish I could be more help,

4    but I have trouble following it.  He testifies at the

5    transcript of the June 10 hearing, 94 basically through 99,

6    that somehow they managed to restore a manhattanadvisers.com

7    user named Justin Cho's email but not Mr. Wood's.  Mr. Cho had

8    a lot of emails that would be relevant to this proceeding

9    because Mr. Wood had sometimes copied him on emails that he

10   sent, but he didn't copy him on everything that he sent, so

11   it's partial.

12          Your Honor asked some questions:  So the world as it

13   existed before was not restored?  And he said:  That's right,

14   it was a partial restoration, just Justin Cho -- I think that's

15   what he said -- and no explanation of why they could restore

16   Justin Cho and why they couldn't restore Mr. Wood's.  I

17   represent to the Court that if it's Justin Cho's emails that

18   provided the source then he must have uploaded Justin Cho's

19   emails.

20          MacHighway has said over and over again in emails, in

21   their -- in the emails that we see in the computerized

22   documents they produced, in responses to document requests that

23   under the exhibit list, they're very short responses in a sworn

24   statement by the president of MacHighway, in email exchanges

25   they had with plaintiff's and defendant's counsel, that when an

E6PTREGA

account is terminated, they overwrite the data on that account

immediately, and within a day or two it's gone, no exceptions,

it can never be restored.

I mean they said that.  These documents are in

evidence.  There is simply no hole in that representation by

them.  They said it back when he was interacting with customer

support.  They said it in sworn filings that were presented for

use in this proceeding.  They said it in responses to document

requests.  No exceptions, when we terminate an account,

everything is overwritten.  They just don't keep it around on

their servers for someone to come back later.  They get rid of

it.  There can't be any dispute about that, your Honor.  And

there's nothing in the record to support the argument that

MacHighway managed to restore these emails.

After the March 31 reactivation, Mr. Wood informs

Mr. Saleem that the material has been restored, gives

Mr. Saleem access to the Manhattan Advisers account on

MacHighway, and Mr. Saleem did a search for documents and finds

documents that are produced.

So I am not suggesting anything improper on the part

of Mr. Saleem.  I believe him when he says that he went to the

Web site and found those documents and produced what he did.  I

have a little bit of disagreement about the first production

versus the follow-up production when we complain the first

production was incomplete.  But I have no question that he was

E6PTREGA

1    acting in good faith at all time, and I am not making any kind

2    of accusation against him.

3            Mr. Wood testified I told Mr. Saleem they had been

4    restored and gave him access to the account at the Manhattan

5    Advisers account, so I think that in a sense Mr. Saleem became

6    an unwitting player in all of this by being put in the position

7    where he could and did argue they were restored because I went

8    to Manhattan Advisers account at MacHighway myself and found

9    these emails there.

10           I would like to refer the Court to the Demonstrative

11   Exhibit 25.  This is focuses in large part on materials we

12   received from Mr. Wood in the production he made after the

13   June 10 hearing and I think it sheds light on his intent and

14   his credibility on certain representations that he made.  It

15   says manhattanadvisers.com account terminated for good.  So

16   April 17, the manhattanadvisers.com account at MacHighway

17   expired, and that is pursuant to a March 31, 2014 automatic

18   cancellation request that Mr. Wood made to Amanda, and it's

19   reflected in the log, Exhibit 10, on March 31.

20           On May 2 we filed our motion for spoliation sanctions,

21   and on May 5 Mr. Wood emailed MacHighway.  These are in the

22   emails that he produced, Exhibit 21, "I cannot access the C

23   panel, please advise."  MacHighway emailed Mr. Wood, "We are

24   showing that the account was canceled, so unfortunately there's

25   no C panel to log into."  Mr. Wood emails MacHighway, "That's

E6PTREGA

not the case.  This account is involved in litigation and it
needs to be turned on now.  I am copying my attorney.  This
need to be escalated immediately."

        Short while later, MacHighway emails Mr. Wood, "This
account was canceled on 2/14/14" -- that should be 4, we have a
sic there -- "by someone logging into your billing area with
the correct credentials at the time.  The account is gone per
your request and has been since that time."

        Mr. Wood emails MacHighway an email communication he
had on April 9 saying, "This was on in April showing that the
account was on and should still be on."  And then the next page
7:00 p.m. he emails MacHighway, "I just sent an email showing
that the account and email were accessible in April, please
escalate this immediately.  Your company has destroyed email
involved in litigation.  That's serious matter."

        So you go to the next entry, and it's from the
president of MacHighway who also gave us a verified statement,
he replies to Mr. Wood, "If you are referring to the account
for manhattanadvisers.com, that hosting package was terminated
on our servers on 2/5/14 as per client request."  If you look
at the log, it was May 5 that there's an entry saying the
termination has been accomplished.  "That means that on that
date, all client data under the hosting package
manhattanadvisers.com was deleted, including but not limited to
Web site files, email messages, and all client access removed,

E6PTREGA

including, but not limited to, Web site and email accounts.
That hosting package and any associated data has not existed
since then."

Mr. Wood goes back forwarding another communication,
email communication from the Manhattan Advisers account on
April 9, "More evidence, please confirm." He goes back with
another email, "The account was up and running in April, why
was it turned off?" A short while later Mr. Wood from
MacHighway, "This was turned off after you had notice of
pending litigation. My attorney will be in touch to sort this
out tomorrow. I hate to find out that you turned off the
account to make your submitted statements true." Finally one
more a few minutes later where he says -- protests his shock
this happened and says towards the end, "Don't tell me you
can't help me. Destroying evidence in an impending litigation
is a serious matter."

So among other things, your Honor, this email exchange
confirms that, by that point, at least, Mr. Wood got the
message that you can't destroy emails while there's a
litigation pending. That certain rings hollow that he would be
making such an argument to MacHighway after the log shows when
he reactivated the account on March 31 he gave direction it
should terminated automatically on April 16 and that it should
not be renewed.

So your Honor, if those materials were still there --

E6PTREGA

1    we don't want to go to the expense, but if those materials were

2    still there one might be able to do metadata forensics on them

3    to see last -- whatever is there, I'm a little rusty on this.

4           THE COURT:  But the suggestion, I think what you're

5    saying is that -- let me see if I have the story right, in

6    terms of the metadata and how it would fit in.

7           On March 31 he reestablishes the account, he uploads

8    certain e-mails, and set it to terminate in April.  Meanwhile,

9    he asks the lawyer go ahead and log into the account, it's good

10   to go.  The lawyer does so and downloads what has been

11   uploaded, but meanwhile the automatic expiration that he

12   previously put in place destroys any metadata evidence that

13   would have revealed the data uploaded or anything else.

14          MR. SPEARS:  Yes.

15          THE COURT:  I hear your theory.

16          MR. SPEARS:  So let me say that I mentioned that he

17   has engaged in a number of record-making exercises in

18   connection with all of these events, and I just want to go over

19   four that sort of stand out.

20          The first is on March 8, 2014, he has an email to

21   MacHighway in Exhibit 14 that says I deleted this domain in

22   January.  And that's not true.  MacHighway's own records,

23   computer-generated records, show that he deleted the domain on

24   February 4.  And he subsequently testified on March 24, 2014,

25   after this March 8 email exchange, that he deleted the domain

E6PTREGA

1    in January, deleted the account in January.  So he's already

2    building a record for this I-deleted-in-January argument,

3    terminated-in-January argument.

4         On March 25, 2014, which is a day after his March 24

5    deposition in which he testified that he's had extensive

6    communications with Mac email about his inability to access

7    downloaded emails on his own computer, for the first time he

8    sends an email to MacHighway saying I can't access the content

9    in my emails, can you help me?  They don't even respond.  It's

10   just like a shot in the dark that is intended to support as

11   best he can what he just testified to the day before about

12   having emails that he can't access.

13        On March 31, 2014, he -- and I would to refer the

14   Court back to Exhibit 14, after this exchange, I direct the

15   Court to -- it's in a later production.  In a later

16   communication which I will find and put on the record, he says

17   after it's opened on March 31, he says to MacHighway in an

18   email, "I can't find -- thanks for helping me, I can't find

19   many things in my sent box.  Can you explain that?"

20        So that is more record building.  It's record making.

21   It indulges the presumption that they restored everything and

22   now he's looking at it, but things are missing from his sent

23   box.  The reply back from MacHighway, and I apologize for not

24   being able to point the Court to this, this is Exhibit 21, your

25   Honor, it's production by Mr. Wood of email exchanges he had

E6PTREGA

1    with MacHighway, and it's on Bates stamp number 011.

2           THE COURT:  There's also another place in the same

3    email occurs, which I do think is actually in 10.

4           MR. SPEARS:  There may be a log of it in 10, but I

5    don't think the content is there, your Honor.

6           THE COURT:  You're right, it's not the content in 10,

7    but I highlighted that same language just a moment ago.

8           In any event, that's the place where it occurs.

9           MR. SPEARS:  In any event, you see on this page Wood

10   011, it's March 31, 8:04, apparently after everything has been

11   restored, and he says, "Thank you so much for all your help.

12   There are only a few items in my sent items folder.  Is there

13   any way to fix this?  That would be great."  And he indicates,

14   "Thanks so much for your help."

15          MacHighway comes back with, "Thank you for your

16   support query.  It would be unlikely that the sent items are

17   available were they in the manhattanadvisers.com account."  So

18   it's impossible to fully comprehend what all the strategy is

19   underlying some of these communications, but it appears that

20   he's uploaded data to the Manhattan Advisers account which has

21   just been reactivated, and he's making a record with an email

22   that his sent items are missing and can they help him with

23   that.  So this is another example of a false exculpatory

24   statement on his part intended to support his version of events

25   and his lack of blame.

E6PTREGA

1             The last one is May 5, 2004, we just went over that

2      exchange, it's in Exhibit 21 where he says, "This is a serious

3      matter.  How can this account be closed?  You can't destroy

4      emails during a litigation."  He instructed on March 31 that

5      the Manhattan Advisers account at MacHighway should be

6      terminated at the end of the prepaid period in mid April.  He

7      knew that would happen, he caused it to happen, and now he is

8      acting as though this is a shock and he's being prejudiced by

9      it.

10             So each of these, your Honor, we think proves the case

11      that he acted willfully, maliciously, and has relentlessly dug

12      in and provided false answers and explanations with regard to

13      it.

14             Let me wrap up quickly, your Honor.  Let me talk about

15      damages and injury.  As you know, and as we made clear, we're

16      seeking a terminating sanction, and we request that the Court

17      strike the defendant's answer and enter a default judgment.  We

18      cited cases in our memoranda and reply memoranda where on

19      conduct less egregious than this courts imposed a terminating

20      sanction.  Among those are cases where a defendant claim or

21      party claim to have recovered everything and now I destroyed it

22      but now I think I recovered everything, and the Court said

23      forget it, we're not going to -- we're not going to presume

24      that what you claim you recovered is the same thing, and your

25      conduct is bad enough that I'm going to impose a terminating

E6PTREGA

1    sanction.

2         Other cases where the spoliating party has argued

3    look, they haven't proven what it is I got rid of that would

4    have been helpful to them, and the Court said, terminating

5    sanction, we're not going to put the burden on the injured

6    party to try to prove what it is you destroyed, you're really

7    the only one who knows that.  So terminating sanction has been

8    employed in cases less egregious than this.  It's not

9    controversial.  It's fully appropriate here where the conduct

10   has gone on for such an extended period from the time we sent a

11   cease and desist letter through the taking of his deposition,

12   through summary judgment practice, through a motion for

13   spoliation sanctions.  It just goes on and on.

14        THE COURT:  So assume for the moment that the

15   plaintiff was able to achieve a terminating sanction, what do

16   you get then that you wouldn't get from just winning on the

17   merits in the litigation?

18        MR. SPEARS:  Well, what we get is not having to go

19   through the burden and expense of trying the case with both

20   hands tied behind our back, because we just don't have the

21   evidence.  And I could imagine at the trial, with the denial

22   and new stories and trying to walk through the exhibits and

23   denial and everything, and it would not be productive.

24        THE COURT:  So if you had a terminating sanction, you

25   end up with a default judgment, then the next issue would be

1    damages.

2              MR. SPEARS:  Correct.

3              THE COURT:  And then you have to have an inquest on

4    damages.  And would spoliation play a role in that?

5              MR. SPEARS:  Well, what we request, your Honor, in

6    addition to a terminating sanction, is an award of monetary

7    sanctions against Mr. Wood in the amount of plaintiff's legal

8    fees in this proceeding.  Because we have gone through an awful

9    lot in terms of briefing and legal work and efforts to chase

10   down the documents.  And given that he started destroying

11   documents from even before we filed the complaint, when we sent

12   him a cease and desist letter, it is an appropriate remedy for

13   Court to impose monetary sanctions on him in the amount of

14   plaintiff's legal fees.

15             THE COURT:  Give me an approximate amount of what that

16   is.  Without binding yourself, do you have a ballpark?

17             MR. SPEARS:  I want to check on that, but I know it's

18   been expensive.  I know it's been at least $300,000 or in

19   excess of $300,000.

20             THE COURT:  So would there be additional damages on

21   top of that that would be sought by the plaintiff?

22             MR. SPEARS:  It is entirely possible that there would

23   be, your Honor.  If we get a terminating sanction and monetary

24   sanctions, I don't think we would seek to prove additional

25   damages.  If we did seek to prove additional damages, it would

35

1  be in the amount of our legal fees, and I just don't know how

2  we do it.

3       THE COURT:  Let me ask you, did you ask for statutory

4  damages?

5       MR. SPEARS:  We asked for statutory damage, and

6  they're quite steep.  So if we sought to do that, your Honor,

7  it would be to have an alternative judgment on the merits, but

8  in the same amount.  We want this over.  We can't keep spending

9  money on this.

10       THE COURT:  I think at least you and the defendant

11  agrees on that.  Everybody I think want this come to an end.

12  And I can actually put myself into that category.  One way or

13  the other, this needs to come to an end.

14       MR. SPEARS:  I make this request for terminating

15  sanction with a plea to the Court to stop this.  It's just not

16  going anywhere productive.  A trial would not be productive, it

17  would be a charade.

18       And I also ask that the Court find that the sanctions

19  are being awarded for willful and malicious conduct as that

20  term is used in Section 523(a)(6) of the Bankruptcy Code.

21  Damage awards or sanctions awards that are based on a finding

22  of willful and malicious conduct are not dischargeable under

23  the Bankruptcy Act.  And we would request that the Court make

24  such a finding in connection with any award that it gives us in

25  this case.

E6PTREGA

1          THE COURT:  Thank you.  What's the -- can you give me

2     the first few numbers of the bankruptcy code to remind me?

3          MR. SPEARS:  Is it 7?

4          THE COURT:  It's one of the low numbers.  We'll figure

5     out.

6          MR. SPEARS:  Bankruptcy Code 523(a)(6).

7          THE COURT:  Let me hear from Mr. Naqui.

8          And Mr. Naqui, at this point, the question is whether

9     we take a short break or whether or not you're likely to finish

10    by noon anyway, and then I will assess how people are doing.

11         MR. NAQUI:  Your Honor, I will say even with a short

12    break, and I request one, that I would be able to finish by

13    noon for sure.

14         THE COURT:  Let's go ahead and take a short break,

15    very short, just to go into the other room and then come back

16    and we'll continue and go until about noon then.  I have

17    another matter shortly after that, but since Mr. Spears took

18    some time, we'll make sure that you have the time that you

19    need, but hopefully it will be not longer than what Mr. Spears

20    used.

21         MR. NAQUI:  Nowhere near, your Honor.

22         THE COURT:  Terrific.  Let's take a short break.

23    Thank you.

24         (Recess taken)

25         THE COURT:  Mr. Naqui, you may proceed.

E6PTREGA

1          MR. NAQUI:  Thank you, your Honor, and thank you for

2     your hearing defendant's arguments today with respect to the

3     alleged spoliation of relevant evidence by my client, Greg

4     Wood.  I do have some prepared remarks, and then I would like

5     to run through some of my notes from plaintiff's arguments and

6     respond to those briefly.

7          Certainly, your Honor, I think the one parties -- or

8     one of the things I think parties seem to agree on, at least

9     pursuant to the papers, is what the appropriate three-part test

10    is that the Court should use to decide with respect to whether

11    Mr. Wood's conduct is sanctionable.  And that test is:  One,

12    did defendant have control over the evidence and an obligation

13    to preserve it?  Two, did Mr. Wood act with the culpable state

14    of mind upon destroying or losing the evidence?  And three, is

15    the missing evidence relevant to the plaintiff's claim?

16    Certainly there can be no argument that plaintiff has the

17    burden of proof with respect to these matters, which defendants

18    respectfully submit has not been met.

19          Certainly as per Mr. Wood's testimony before this

20    Court, he fully understands and is aware that some of the

21    actions he had taken in this case are regrettable and showed

22    poor decision-making, to say the least.  Therefore, we do not

23    argue, your Honor, that defendant did not have control over the

24    evidence or that he does not have an obligation to preserve it.

25    Certainly Mr. Wood's sworn statements, deposition testimony,

E6PTREGA

and testimony at the hearing show that he was wrong in

believing that he did not have an obligation to preserve any

and all potentially relevant evidence.

          With respect to the second prong, however, requiring

the defendant to have the culpable sustained of mind, once

again, looking at everything in hindsight, we can certainly

understand how it would seem that defendant was acting with

some sort of malice.  But to the extent that Mr. Wood has

explained his actions to this Court, while there is no question

that he acted irresponsibly, it should not be held that he

acted with malice.  His explanation for why he deleted emails,

which are the crux of the motion before your Honor, which is

that he believed that his possession of these emails would

continue to generate suspicion with respect to any alleged

infringement, is, as I said, consistent and clear, he stated

that throughout at any time he was asked.

          As he stated, he wanted this lawsuit to end as quickly

as possible.  Which as your Honor pointed out, is something

that seems all parties are in agreement about.  And he also

made significant efforts, like the motion to dismiss and motion

for summary judgment, in order to help get this lawsuit over

quickly.  Certainly it could be inferred, and not unfairly,

that filing those kinds of motion, contrary to plaintiff's

arguments, is actually an effort to end the case quicker and to

save money, which has been his position from the outset, that

E6PTREGA

he has two small companies, and he himself did not have the

wherewithal to enter what has now become a long and drawn-out

litigation.

Afterward he tried to work out a settlement.  His

explanation regarding the termination of the MacHighway account

has also been consistent and clear.  He had no idea that

terminating the account would mean losing his emails.  As he

testified, he had previously terminated the Web hosting

accounts before and never lost emails because of it.  His

emails to MacHighway afterwards contrary to plaintiff's

position, actually support his explanation, both the email in

which he mentions that he can see the email headings but not

access the content, and the email in which he asks MacHighway

about the status of the emails after he terminated the account

in January, which is when he believes he terminated it, support

his position that he had no idea that terminating the account

would mean losing all of his emails.

The whole situation with MacHighway leaves questions

unanswered.  At the very least, however, I believe there are

reasons to doubt some of the responses provided by MacHighway.

As Mr. Saleem pointed out at the hearing, he was able to access

Justin Cho's email from his computer and not Mr. Wood's.

Plaintiff argues today for the first time Mr. Wood must have

somehow uploaded even Mr. Cho's emails onto the MacHighway

servers.  One, there's no record from Mack MacHighway, as I

E6PTREGA

1   imagine there would be if something like that were uploaded,

2   and two, we have had no evidence -- and again, plaintiff has

3   the burden here -- to show that, one, that Mr. Wood even had

4   possession of those emails, and two, that he uploaded them.

5          THE COURT:  Tell me what, in your view, would be

6   MacHighway's motivation to not be straightforward about what

7   happened?

8          MR. NAQUI:  So I'm not taking the position, your

9   Honor, that they have any motivation to not be straightforward.

10  I think this started out as an issue, and certainly

11  MacHighway's counsel said this over and over again where they

12  felt like they shouldn't be involved, they didn't want to have

13  anything to do with it.  They took the position that they

14  wanted to be as little involved as possible.  I think they

15  responded to the first subpoena and took the position that

16  would be it.  And then when both sides started probing with

17  more questions, more and more information came to light that

18  needed to be explained.

19         The one example I point your Honor to, as Mr. Saleem

20  testified to and also stated in his affidavit, was that they

21  still don't know who the person was that logged in as Amanda M

22  on March 31.  It wasn't Amanda M, that we know for sure.  We

23  have got confirmation from MacHighway's counsel.  But it turns

24  out that -- and we again, didn't find this out initially but

25  only found it out over time as we continued to probe, that the

E6PTREGA

company that provides the tech support for MacHighway isn't

MacHighway, they have a third party that does that.  So again,

we still don't know who they are, although we asked.  We still

don't know what the relationship is exactly.  But we were

provided responsive documents from MacHighway as have now been

forwarded and provided to the Court in today's hearing.

So I'm not suggesting, and certainly don't mean to

suggest that they had some kind of ulterior motive here.  I

think at the end of the day they didn't want it deal with and

they wanted to sweep this under the rug as quickly as possible.

And I believe -- and again, this based on Mr. Saleem since he

was the one that dealt with them specifically, but I believe

that somebody in that tech support company, that third party,

found a way to reactivate these accounts.  And I think that the

testimony and the evidence that is shown is supportive of that.

Unfortunately, that doesn't appear in MacHighway's records, and

for liability reasons I could see why it wouldn't, although

again, I certainly don't mean to suggest any wrongdoing on

their part.

THE COURT:  All right.  I hear you.

MR. NAQUI:  Also there's nothing in the MacHighway

evidence provided with respect to what happens when a user

activates the C panel.  The logs provided by MacHighway have to

to with communications back and forth and people who enter

ticket numbers and logs that are created from that.  I don't

E6PTREGA

1    see any logs, and I don't know if any exist when or if a person

2    activates the C panel, which is, from my understanding from

3    Mr. Wood's testimony, which hasn't been controverted in any

4    way, located on Web site control panel I guess is what you call

5    it, where he, according to his testimony, hit a button that

6    says terminate account or whatever it was.  There are no logs

7    are evidence with respect to that ever happening.  That could

8    certainly mean that it never happened, or it could mean those

9    logs are kept separately or distinctly from the logs that were

10   provided to us.

11           At this point what I also say is given the way this

12   all came down, MacHighway was asked to provide documentation

13   very quickly in a very short window and short period of time.

14   That may also be a reason why some of these questions still, to

15   this day, your Honor, remain unanswered.

16           That being said, before I move forward to my next

17   point, I think lastly with respect to the second prong,

18   Mr. Wood's personal situation at the time, which he explained

19   to the Court and which is also outlined in his affidavit, plays

20   a role in this as well.  Certainly, as I'm sure we can all

21   appreciate, it could not have been easy for Mr. Wood to sign an

22   affidavit and talk about things like his divorce and child

23   custody issues, failure of his businesses, et cetera, but he

24   did those things to make a showing to the Court while he

25   certainly made mistakes, he did not in any way act with malice.

1              With respect now, your Honor, to the third prong --

2              THE COURT:  Before you move on to the third prong, why

3    don't you address negligence, because you are aware in the

4    Second Circuit a culpable state of mind can be demonstrated

5    through negligent actions, although that impacts the type of

6    sanctions.  So why don't you discuss that.

7              MR. NAQUI:  It's a fair point, your Honor, and

8    certainly I think the key word there is "can."  Certainly I

9    think all the case law shows that a lot of this falls in your

10   Honor's discretion based on her examination of evidence and

11   hearing the testimony of the alleged spoliator in this case,

12   Mr. Wood.

13             But he's admitted to, and I think there's no way to

14   sugar coat or hide it, that he made mistakes.  To the extent

15   that those amount to the type of negligence that your Honor

16   would rule are subject to sanctions in this case, certainly our

17   position is that they don't.  I think he certainly made

18   mistakes.  I think he has made, as I will address a little

19   later in my discussions, significant efforts to address those

20   mistakes and provide whatever emails and evidence that he

21   could, and I feel like he provided everything at this point.

22             Certainly plaintiff's argument is:  How do we know

23   that?  I come back to something that counsel stated earlier:

24   You're asking to prove a negative.  He is saying they don't

25   exist.  He's saying he found everything, and he's saying that

E6PTREGA

```
1    everything that he may have deleted would have been copied --

2    Mr. Cho would have been copied on, so when they were finally

3    able to access Mr. Cho's email, Mr. Saleem was able to provide

4    whatever emails that may have been deleted.

5         THE COURT:  But he did testify -- I specifically asked

6    him whether or not certain types of individualized

7    communications would have been copied to Mr. Cho, and I believe

8    he said no.  For instance, the ten or so last emails that went

9    to the large distribution list in some undifferentiated

10   fashion, those might have been in Mr. Cho's email, but if there

11   had been individualized communication, I think he testified

12   that would not have been.

13        MS. NAQUI:  I think if you give me a second I could

14   grab the transcript and we can have a look at the testimony.

15        THE COURT:  Yes.

16        MR. NAQUI:  So we were looking your Honor, page 97 of

17   the transcript from the hearing, and there was a point -- and

18   you're correct, where you said to Mr. Wood, "You didn't restore

19   world as it existed?"  And he said "Yes, that's right."  And

20   you said -- your question was, "You restored access to

21   MacHighway and you paid for MacHighway," and his response,

22   "That's right."  Next question, "Not Justin Cho's emails that

23   which, for whatever reason, have not been deleted."  He said,

24   "That's right."  Now your question, the important one, "Is it

25   your testimony that because Justin Cho was copied on
```

E6PTREGA

everything, therefore everything was maintained?"  His response

was, "Yes."  He did go on to explain, however, he wasn't copied

and everything, but he was copied on those things, the RFG

reproduced material that was distributed, but not every single

email that was sent out.  So I think to the extent that -- what

that does say, your Honor, is there are a lot of unrelated RFG

material that he would have been copied on.

        I would also like to point out, your Honor, that what

was provided to of plaintiffs, there are numerous emails,

individual emails between Mr. Wood and other individual parties

that may have been interested in either helping market the

product or be involved in some way with respect to this

Pathfinder product.

        So I think Mr. -- my understanding of the testimony is

that Mr. Wood's position is that those are it, that what has

been provided is it, that we have been able to access -- that

the only things that he recalls deleting were these larger

emails that contained this issue, these larger group emails,

and he believes that between what he was able to access when

the MacHighway account was restored and what he was able to

access through Mr. Cho's email, he believes he has everything,

and certainly will admit that doesn't necessarily mean that he

did find everything.  I guess not, but there's no way to prove

it.  There's no way to prove the negative that he doesn't.

Certainly he made -- I think the important point I'm making

1     here is that he has made significant efforts to correct his

2     wrong, and that I should be taken into account with respect to

3     certainly the second prong.

4          So moving forward, your Honor, to the third prong,

5     which requires that the alleged missing evidence be relevant to

6     this matter, I think this is a key issue.  And a proper

7     analysis of this issue requires that we look at the context of

8     the case itself and the relevant position of the parties.  What

9     we have before us, your Honor, as your Honor very well knows,

10    is a copyright infringement case against two small companies

11    owned by the same individual who had no more than a couple of

12    part-time contractors working for him at any given time.

13         THE COURT:  Well, let me ask you, as I understand the

14    chronology, and I may not have a perfect understanding of the

15    chronology in terms of the early history of the case, which is

16    a matter about which we have not spent a great deal of time in

17    the context of this motion, Manhattan Advisers really came into

18    existence not necessarily because of the deal with Regulatory

19    Fundamentals, but not too temporally distant from the deal, if

20    you will, with Regulatory Fundamentals, and it was

21    incorporating -- well, I guess, number one, is that right?

22         MR. NAQUI:  To be honest, your Honor, I couldn't tell

23    you exactly what the chronology was in terms of how close in

24    time Manhattan Advisers was created.  I thought from my

25    recollection, and certainly it's just a recollection at this

E6PTREGA

1   point, I thought it had existed for some time prior to the deal

2   being made.  I thought the issue was, and probably still is,

3   whether or not Mr. Wood had the right to market, quote,

4   unquote, these materials on the Manhattan Advisers account.

5        THE COURT:  Let me tell you where I'm going.  I'm

6   trying to figure out in terms of relevance whether there's any

7   real delta between Manhattan Advisers and all communications

8   with potential customers of Manhattan Advisers had and its deal

9   with RFG.  In other words, if its primary communications, at

10  least for some period of time, whether it's the beginning of

11  the company or not actually is sort of irrelevant, let's assume

12  during some period of time subsequent to the deal with

13  Regulatory, Manhattan Advisers' primary communications with its

14  hoped-for customers is utilizing the regulatory material as a

15  primary marketing effort, then one would think that everything

16  flowing in terms of marketing efforts through Manhattan

17  Advisers during that period of time could be relevant.

18        In other words, let's put it in terms of what the

19  plaintiffs are saying, if what they're doing is misusing the

20  information for a period time, if the information is the

21  primary marketing efforts during that period of time, then one

22  would think that all of the emails are potentially at least one

23  or way or the other relevant to the claims in the lawsuit.

24        MR. NAQUI:  What I would argue, your Honor, is we're

25  dealing with a copyright infringement case, so the issue is

1    whether or not he sent it out.  And if they're seeking

2    statutory damages, certainly each time he did, and I think

3    there's an issue of whether each individual email to each

4    person on the BCC or each individual itself counts as an

5    instance for the purpose of statutory damages.

6              THE COURT:  Or lost profits.  An alternative way would

7    be lost profits.  So for instance, to take the most nefarious

8    potential example, if he sent out an email to RFG's customers

9    saying I can do this for you and I can do it better and I can

10   do it cheaper or more cheaply, and a few of them respond and

11   say hey, we're very interested in that, give us some pricing,

12   and there was some back and forth on that.  And let's assume

13   for the moment that that company ended up terminating its

14   relationship subsequently with Regulatory Fundamentals perhaps

15   because of that, perhaps for a totally unrelated reasons, they

16   might be able to claim some lost earnings stream.

17             MR. NAQUI:  So my understanding of the complaint is

18   that it doesn't -- is that that's not the argument that is

19   being made.  My understanding of the way the system was

20   supposed to be set up is that Mr. Wood would be, quote,

21   unquote, I guess marketing these products using his own name,

22   but that if anybody wanted to subscribe to Pathfinder, which

23   they would find out about through Mr. Wood's marketing, it

24   would still come through them, and he wasn't offering it --

25   there was no way they could purchase it at a different price.

E6PTREGA

The purchasing mechanism, my understanding is, was still

through Regulatory Fundamentals, through the plaintiff.

THE COURT:  So that lost profit theory -- I'm just

trying to speculate, Mr. Spears, it's up to Mr. Spears, but I

hear what you're saying in terms of this all goes back to the

question of relevance.  And my suggestion to you was unless

there's some major marketing effort apart from the utilization

of these materials, then arguably all the emails could have

been relevant.

MR. NAQUI:  Right.  So my response would be, your

Honor, that, if I'm understanding you correctly, again, that if

the lawsuit is about copyright infringement, removal of a

copyright illegally, adding another copyright onto a product

illegally, the only relevant issue with respect to damages, if

what we just discussed about in terms of their lost profits

doesn't apply, is statutory damages.

So the question becomes:  Did he do it?  Now certainly

there's enough evidence that has been provided to plaintiffs,

and they're not making an issue of in today's hearing that he

did do it.  He's admitted to -- and there's evidence of that

was provided to them -- him forwarding these emails to his

customer list.  There's evidence of him putting it on his Web

site, which potentially they could argue, should they chose to

do so at any sort of an inquest or damages trial, that that

would have garnered more views or hits than an email going to

E6PTREGA

1   400 or 500 people.

2          THE COURT:  Go ahead.

3          MR. NAQUI:  To finish the point, if Mr. Wood has

4   admitted and evidence has been provided to the plaintiffs of

5   what exactly was put on Web site, and the evidence also shows

6   that what was put on Web site is what was forwarded to all of

7   these people on the customer list, I understand Mr. Spears'

8   position they didn't want to see the customer list, but in my

9   opinion that's the most relevant thing is who is on that

10  customer list.

11         And if at the end of this litigation, however it is to

12  end, if they're right, then those people will have to be

13  notified that they may have received certain materials that

14  were in violation of a copyright, and that they should destroy

15  or remove those documents or those materials immediately.

16  Outside of that, I don't see what other purpose there is of

17  getting any other emails, if there are any.  And again,

18  Mr. Wood's position is that there aren't, but if there were any

19  others, I don't see what they're going to get from them.

20         THE COURT:  Well, I will let Mr. Spears address this,

21  but just to get your response, with statutory damages, of

22  course with the Copyright Act there are two types, there's base

23  statutory damages and statutory damages for willfulness.

24         Among the kind of factors that a Court takes into

25  account for a willfulness finding, and I should say a finder of

fact, because sometimes that's a jury question, are things such
as the number of instances.  And while one award of damages is
due for each copyrighted work, the number of times that
particular copyrighted work has been infringed goes to the
question of willfulness.  There can be other types of conduct
which potentially could inform the willfulness question.

So just to push back on your argument, what if these
emails said gee, I just saw the same stuff from Regulatory, are
you working for them?  And if he wrote back and said no, I give
them my work regularly and get paid a fee, so he is sort of
building himself up in front of his potential customers, that
might go to the willfulness aspect.  Again, I have no idea what
these emails say, but that's sort of the point.

MR. NAQUI:  I understand, your Honor.  My response
certainly would be that it comes back again to the agreement in
and of itself, which has been Mr. Wood's defense from the
beginning.  Either the conduct that he has admitted to is
copyright infringement and the agreement doesn't protect him,
or the agreement does protect him.  And that even if he were to
say something along the lines of what you just suggested, that
arguably could be protected by the agreement as well.  We just
don't know, but that's an affirmative defense issue.

And I would also argue that the question of
willfulness, even in the context of statutory damages, although
a factor -- certainly the factor of how many times it was sent

1  out certainly exists, I will argue that in this case, the main

2  factor would be whether or not Mr. Wood had reason or

3  reasonably believed that the agreement allowed him to do what

4  he was doing.

5          If a judge or a jury, finder of facts finds that he

6  did, I argue that the willfulness finding could be made in his

7  favor, that he wasn't willful.  Which, again, I think strangely

8  enough comes back to today's hearing as well, which is

9  Mr. Wood's testimony has been consistently that, one, he

10  believed what he was doing with respect to the content prior to

11  when the lawsuit was filed was within his bounds, and certainly

12  he believed -- and this part wrongfully -- that because of the

13  constant notifications he was receiving, whether in writing or

14  at a deposition, that he may have somehow been still

15  responsible for this, he wanted to remove that suspicion, as I

16  stated earlier, by getting rid of emails.

17          Again, it was the wrong thing to do.  He knows he made

18  a mistake.  I think very credibly and in front of the Court he

19  testified to that, and he regrets his actions, but he certainly

20  did, I point out, make significant efforts to rectify and

21  correct the mistake that he made.

22          Your Honor, I want to address for a little while what

23  Mr. Saleem proffered to the Court, and the fact that additional

24  discovery was provided to the plaintiffs after the motion was

25  filed.  Contrary to plaintiff's contention, the fact that I

think Mr. Saleem's proffer very clearly showed that the

failure, and it was a failure by defendants, to provide certain

evidence prior to the motion being filed was simply a mistake

on his part.

I don't think he was -- I know Mr. Spears didn't use

this term, but I will, a puppet, Mr. Saleem, and that he was

conned or fooled into doing this.  I think his proffer to the

Court and his affidavit are also very credible in that he has

certain issues himself as an attorney, as an officer of this

Court, he has certain issues with MacHighway's responses to his

questioning and to document requests.  And those led him to

believe that the account actually was reinstated and the emails

were made available after March 31st.  And again, I won't speak

for him, but it's in the record of what his contentions and

beliefs were with respect to what happened.

Your Honor, in conclusion -- I won't say in

conclusion, but after this short conclusion I will head into

some of my notes about plaintiff's motion papers and oral

arguments here today put the focus squarely on Mr. Wood's

conduct, which they interpret to be in bad faith.  They point

to the fact that he is a Cornell Law graduate, but don't

appreciate the fact he was never a litigator nor ever been

involved in a litigation outside of a personal divorce.

They pointed to his refusal to waive the

attorney-client privilege and allege that this should have

E6PTREGA

created a negative inference.  Certainly the refusal to waive

that privilege, in my opinion, should not have created any

negative inference, given how hallowed and privileged it is.

But more importantly, based on the Court's urging, we did, to

erase any iota of any doubt, go ahead and agree to a limited

waiver of privilege, which hopefully has resolved any concerns

raised by that issue.

To the extent that we have been able to explain that

Mr. Wood's actions were a result of making poor choices, as

opposed to intentionally seeking to prevent plaintiff from

obtaining evidence, we ask your Honor to consider same when

making your decision.

I think that raises an important point that I wanted

to expound on a little bit based on some of the things that the

plaintiffs have argued here today.  There are a number of, in

my opinion, questions that are left unanswered.  If the picture

that was painted today is an accurate one, and that picture

being that this was some kind of a long and drawn out and well

crafted with tremendous incredible foresight plan by Mr. Wood

to spoliate or destroy evidence and somehow protect himself, as

I already argued, I don't think it protects him at all.

He's already admitted to putting the stuff on his Web

site.  He's already admitting to sending out at least ten

emails to at least 400 people.  So if that is infringement,

which I know is still an issue yet to be decided by the Court,

1   but if that is, he admitted to it.

2          Again, will be a willfulness argument, but with

3   respect to the statutory damages of actually doing it, he

4   admitted to it.  To what that amounts to in terms of actual

5   dollar money, it probably amounts to more than what plaintiffs

6   have already said they would be willing to take in this case to

7   have it end now.  So I don't see and I don't think there's been

8   any showing of what he really would have gained or has gained

9   by doing this.

10          More importantly, there's a lot of questions

11   unanswered with respect to how he executed this alleged

12   brilliant plan of sending fake emails to people saying things

13   just to set up a story and so on and so forth.  If he was

14   looking to delete emails, it shouldn't have been so hard to get

15   all of them.  Given today's technology, it shouldn't be all

16   that difficult to simply delete them all if that's what he

17   really wanted to do.  But I think he's been very credible in

18   testifying that, one, he's not that technically proficient, but

19   two, that all he did was just go through and delete what he

20   thought were emails that were at that time -- and granted,

21   hindsight being 20/20, he realized now was a mistake -- but at

22   that time were actually hurting him.

23          If we're talking about something he did April, May,

24   June of last year, and then bringing it back again to things

25   that happened in January, February, March of this year, and

E6PTREGA

1    April of May now and June, certainly if this was some part of

2    nefarious plan, he would have done a better job, quite frankly,

3    than the evidence shows that he did.  But that actually leads

4    me to believe that this wasn't part of any nefarious plan.

5           Something counsel said earlier when he was reviewing

6    what he thought were, quote, unquote, record making exercises

7    by Mr. Wood, he said it's impossible to fully comprehend what

8    the strategy was or is.  My response would be that's probably

9    because there is no strategy, that look, he's already admitted

10   to doing something wrong, why admit to it and then go through

11   some kind of half-hearted exercise of deleting potential emails

12   that may or may not hurt him more than the amount that he's

13   already hurt?  It's not as if there could be even -- there's

14   only a finite number of copyrighted material, so it's not as if

15   there were more than ten and closer to 20 or even five or ten

16   more individual e-mails or even hundreds of more individual

17   emails that are still contained in the finite material that is

18   finite and laid out in the amended complaint.  I don't see how

19   it could -- I don't see how he was protecting him himself in

20   any way, and I don't see how -- I guess the point I'm trying to

21   make is it takes away from a finding of malice if the fact that

22   he admitted to doing what may or may not be copyright

23   infringement depending on what the Court finds later on.

24          THE COURT:  Although I don't think that has ever

25   really been in doubt, really.  Since the very beginning of the

E6PTREGA

1    case the defense has always been, from well before the time

2    spoliation even came to Court's attention, it's always been

3    that he certainly sent out materials from Regulatory

4    Fundamentals and he certainly sent them out without

5    attribution, but that he believed he could do so.

6            So I don't think that the fact of infringement has

7    ever been a viable defense, or non-infringement has been a

8    viable defense, it's if in fact his reading of the contract is

9    wrong.  So he's always bet on his reading of the contract, if

10   you will, or a settlement, and I think it's more the latter

11   than the former.

12           MR. NAQUI:  I would argue it's just as much the latter

13   or the former.  I think the settlement discussions, based on

14   his own testimony, were based on the fact when he wanted this

15   to end, that he was willing to give up the fight so this could

16   end, he could not have to pay for legal counsel anymore, and

17   all the other costs associated with litigation, and frankly,

18   move on with his life and close down two businesses.  And now

19   he has another job, which the Court is already aware.

20           THE COURT:  What's he doing these days?

21           MR. NAQUI:  I think he's in finance.  I have to ask

22   him exactly.

23           THE COURT:  He's not acting as a lawyer?

24           MR. NAQUI:  I don't believe so.  I don't believe so,

25   but I could certainly confirm that for your Honor if it's

E6PTREGA

1    relevant.

2              THE COURT:  What other points did you want to make?

3              MR. NAQUI:  Give me one second, your Honor.

4          So there were assertions made about Mr. Wood opening

5    another domain in April.  What I would say with respect to

6    that, and certainly unfortunately Mr. Wood isn't here to

7    testify or be questioned about it, but that information was

8    available to -- at least the fact that this domain was opened

9    was available to the plaintiffs at the hearing.  He wasn't

10   questioned about it.  There's no evidence on the record with

11   respect to it.  I don't think it's fair to make any

12   presumptions or assertions one way or the other with respect to

13   why he did it, whether it has anything to do with anything

14   related to this case since he was never questioned about it and

15   given an opportunity to explain.

16         I will speak quickly to plaintiff's counsel's comments

17   at the end with regard to damages and injury.  I think your

18   Honor was absolutely right in saying look, all parties want

19   this case to end.  This issue of willfulness seems to have come

20   up again now with respect to counsel's request that Mr. Wood's

21   actions be deemed willful with respect to the appropriate and

22   relevant sections of the Bankruptcy Code.  Certainly obviously

23   we'll oppose that.  But it does, in my opinion, provide an

24   explanation of why we're here, maybe because I think that was

25   the amount that would have settled the case, and I know it's

E6PTREGA

 1      not evidence, but it would have settled the case months ago.

 2              I certainly don't believe that the record reflects

 3      plaintiff met their burden that Mr. Wood's actions were

 4      willful.  Also at the same time I will state that I have

 5      certainly gotten no indication from him that he's looking to

 6      file for bankruptcy or anything, but I understand plaintiff's

 7      caution with respect to the issue.

 8              I do think this matter should be settled.  I think

 9      everyone is in agreement on it.  I wish we could put this

10      behind us and come up with a number that makes sense and have

11      the case go away.  That's been my client's position for quite

12      some time.  I know to the extent that those 400 to 500,

13      whatever the number is, of people who are on Mr. Wood's email

14      list or Manhattan Advisers' email list, to the extent that as

15      part of the resolution of this case they would need to be

16      notified, I don't think my client would have any problem with

17      that, assuming the language is appropriately worded, if this is

18      resolved out of court, but to put on the record I don't think

19      that would be an issue.

20              And I think that also goes to show and prove that if

21      he's willing to give you the list, willing to show you anyone

22      added or deleted from the list in whatever time period the

23      plaintiff would be looking for, I imagine going back from the

24      date the contract was entered into, my client is willing to

25      provide that as a resolution.

E6PTREGA

1          I guess last but not least I point out the case law is

2     also very clear that your Honor has broad discretion in these

3     types of cases not only with respect to making a finding of

4     spoliation but also with respect to what is a fair and

5     equitable resolution.  Certainly to the extent that counsel is

6     arguing that terminating sanctions are fair and equitable here,

7     and I think Mr. Saleem's papers argue the point well, I

8     certainly don't think this is a case where that is deserved.  I

9     think there are a number of issues of fact that are relevant

10    with respect to defendant's defenses that have nothing to do

11    with whether or not any emails were allegedly spoliated.  So

12    that as a -- certainly as a potential resolution I don't think

13    makes sense in this case.

14         I do believe, as opposed to a monetary sanction,

15    although I think most of the cases that discuss this issue

16    discuss it in terms of a kind of a last resort resolution for

17    courts, but I think it's more appropriate in this case for some

18    kind of -- if this case does go to trial, some kind of jury

19    instruction with respect to this issue, certainly one that

20    would have to be discussed and agreed upon.  Or if your Honor

21    were to decide on it, however she would make a ruling, but that

22    actually might be a more fair resolution given the fact that

23    Mr. Wood has admitted to providing or sending out these

24    e-mails, something along the lines of -- I'm honestly thinking

25    off the top of my head, but something along the lines of any

E6PTREGA

1    emails or any copyrightable content that any evidence indicates

2    that Mr. Wood has forwarded to his list or that he has

3    forwarded at all can be assumed that it went to everybody on

4    his list.  Something along those lines with respect to

5    calculating damages, I don't think my client would be adverse

6    to that either, just as another way of potentially resolving

7    it.

8                Thank you very much, your Honor.

9                THE COURT:  Thank you.

10               Mr. Spears, we're already over time, but if you had a

11   couple of things to say, pick your best and --

12               MR. SPEARS:  I have two.

13               THE COURT:  All right.

14               MR. SPEARS:  First, I direct the Court's attention --

15   I make this representation on the record, the Exhibit 14,

16   landscaped, page 2 of 11 at the top, it indicates that the

17   manhattanadvisers.com domain and hosting account were opened,

18   that the 9/19/2012, I note the amended complaint alleges that

19   the agreement was entered into on October 30, 2012, and that

20   various papers that have been filed with the Court previously

21   indicate that there was a run-up to the agreement being signed,

22   including extended negotiation.  So it appears Manhattan

23   Advisers was created at the same time as the dealings with RFG

24   that led to the entry into the agreement.

25               And then finally you asked the question, your Honor,

E6PTREGA

1    about whether we can -- how we can know that the new account

2    that Mr. Wood opened is reflected in the log, Exhibit 10, is

3    the start-up survivor account.  And I will state this on the

4    record and documents will support it, the exhibits will support

5    it.  There's an entry on the log for April 12, 2014 that

6    indicates an invoice was issued for 286888, that's the number.

7            And then I direct the Court to Mr. Wood's production,

8    which was the first time we learned about the start-up survivor

9    account, Wood 022, they terminated his start-up survivor

10   account on June 6, just basically pushed him out the door.

11           If you go to Wood 028, they're informing him as to the

12   amount of credit he's getting, and they have got the start-up

13   survivor, April 12, 2014 to April 11, 2015 with the initial

14   scheduled date, and they pro rate and give him back money.  And

15   they have an invoice number 286888, which is the same invoice

16   number that we see for the log entry on April 12 in Exhibit 10.

17           Your Honor, thank you for all your time on this.

18           THE COURT:  Sit down for one second.  I don't want to

19   cut you off for your last statement, I saw Mr. Naqui getting

20   up, I want to make sure you don't leave yet.

21           MR. NAQUI:  I'm not leaving, your Honor.

22           THE COURT:  Mr. Spears, were you done?

23           MR. SPEARS:  Yes, I was, your Honor.

24           THE COURT:  So here is what the way in which we're

25   going to proceed.  I am going to give you a bottom line ruling

E6PTREGA

right now, and I am then going to draft a thorough opinion.

Because the case is not over, it's not yet an appealable order,

but I don't think that Mr. Wood's plan was such a brilliant

plan.  I think that it happened in dribs and drabs, but

unfortunately that is not inconsistent with spoliators because

bad judgment can lead to poor execution of a plan.

I do find that there has been spoliation of relevant

evidence with the requisite culpable state of mind.  Indeed, I

find it was willful and malicious pursuant to the Bankruptcy

Code Section 523(a)(6).

I understand that -- and Mr. Naqui, I have to say I

think you argued this about as well as it could be argued, and

I would not expect that you would ever make any concessions as

to willfulness or malicious conduct, and so the fact that you

have raised those questions which one could draw competing

inferences is exactly what one expects from highly competent

counsel.

I, however, draw the other inference, and I will lay

out those various factual points and the inferences that are

drawn.  I would say that in my view the evidence is clear, it's

convincing, and indeed it's distressing.  We've got this fellow

who is very intelligent, articulate, he was a Wachtell

associate.  This is not the kind of fellow who should not have

clearly understood what was going on.  Indeed, I find that he

did know what was going on.

E6PTREGA

            Whether or not he deeply regretted things and was
trying to dig himself out of a hole here and there, the realty
is I think he knew he was destroying documents when he
destroying them that he shouldn't be doing it, but he was
trying to fix what he thought was a bigger problem that he
could eliminate, then he wanted to settle to try to put a cover
over it, and it just got frankly worse and worse.

            There were, in my view, at least three instances of
spoliation as groups, three groups I should say.  One was the
manual deletion, the second was what I call the first
MacHighway deletion of account, and the third was the second
MacHighway deletion of account.

            So if there was ever any question as to which way the
inferences should be drawn, the second MacHighway deletion is
just devastating, because there's no way in the world that an
intelligent person wouldn't have, the day that the account was
allegedly put back into existence, which I'll talk about in my
opinion, I don't think it was put back into existence in any
real way, boy, you make sure that you had done everything
possible to have it held on to.

            But in any event, I do think that he acted, as I said,
willfully and maliciously.  I think that the plaintiffs have
well and truly exceeded the burden of proof which they have to
carry.  And I will lay it all out, but I do find that the
missing information -- while some of it was produced, the

E6PTREGA

1    missing information was plainly relevant.  Whether or not it

2    would be admissible at trial, I don't know, but the question of

3    relevance in terms of spoliation doesn't mean it has to be a

4    dagger to the heart of the plaintiff's case, it means it has to

5    be relevant, and under the rules of discovery, it certainly is.

6         So that is my finding on the motion.  Plaintiff's

7    motion is granted.  I will put forward my determination as to

8    nature of sanction in the decision, in the written decision.  I

9    need to go through a number of different cases in this area and

10   really study the way in which the sanctions have been devised.

11        I am seriously considering a terminating sanction, but

12   I am not ready to have that in an order.  I say that because if

13   there's any chance that the defendant would like to try to

14   settle this matter, he can attempt to do so.  This order will

15   be reflected in a one-paragraph order that would go -- if the

16   plaintiff is inclined, the order on spoliation will go up today

17   as a one-paragraph order, but the decision will follow.

18        This is a fellow who -- there are serious implications

19   to his law degree for having a written decision that will say

20   what it says.  I say that not to in any way suggest that he

21   should do something he doesn't believe he should do.  If he

22   wants to then take my decision up on appeal and seek

23   vindication in that manner, that is, of course, his right.  I

24   say it only because you can then convey to your client that the

25   Court did say this.  I will tell you it will take about two

E6PTREGA

1    weeks to write the decision, but it won't take much longer than

2    that because I know what I am doing over the next week, and it

3    will be in the queue after that.

4          So the motion has been decided but the decision will

5    lay out the nature of the sanction itself as well as the

6    rationale, and I don't see any prejudice flowing from the lack

7    of the rationale being fully stated right now on the record in

8    light of the fact it's interlocutory at this point.

9          I want to thank counsel for very well argued papers.

10   Things were frankly a bit of -- they were all over the place,

11   Mr. Naqui, until you came into things, frankly.  So it's your,

12   I think, articulate presentation of the best defense that could

13   be provided here was quite a breath of fresh air.

14         Let me say one more thing, which is -- and I will have

15   to figure out how I deal with this in the decision -- I don't

16   find there to be much of a close call about the interpretation

17   of the contract.  The procedural way in which the prior motion

18   was brought forward did not pose the question in a way that

19   would have allowed the Court to have granted summary judgment

20   to the plaintiff at that time on exactly all of the issues.  I

21   think there were some but not others.  And I think the

22   defendant moved for summary judgment, that was context.

23         MR. SPEARS:  Yes.

24         THE COURT:  So if the plaintiff moved for summary

25   judgment, I think the contract, in my view, is relatively

E6PTREGA

1    straightforward on its face.  So the idea this could have

2    been -- and if a Wachtell corporate associate, and I'm not

3    focusing on the firm so much --

4            MR. SPEARS:  I'm so sorry to interrupt, but on behalf

5    of my friends at Wachtell, he was at Orrick Herrington.

6            THE COURT:  Orrick Herrington.  I knew it was a major

7    national firm.  So he's at a major national firm, he went to a

8    very good law school, he's articulate and smart, which is more

9    important than what firm he was at or what law school he went

10    to, he clearly is articulate and intelligent.  I can't believe

11    he believed in that interpretation of the contract.

12            But that finding doesn't -- that's not a finding

13    because he did not testify to that, and the Court's decision on

14    the spoliation motion is not based on a determination as to his

15    personal state of mind with respect to that one issue about his

16    interpretation of contract.  I, as a legal matter, think it's

17    clear, and I have lots views about his state of mind otherwise.

18            All right.  So that's where we'll stand.  I will issue

19    that longer opinion, but the order is as it is.

20            Thank you.  We're adjourned.

21                     o0o

22

23

24

25